## BROWN v. GUARANTEE TRUST AND SAFE DE-POSIT COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

No. 20. Submitted April 25, 1888. — Decided November 19, 1888.

It is not indispensable that all the parties to a suit in equity should have an interest in all the matters contained in the suit; it will be sufficient, in order to avoid the objection of multifariousness, if each party has an interest in some material matters in the suit, and they are connected with the others.

To support the objection of multifariousness to a bill in equity, because the bill contains different causes of suit against the same person, two things must concur: first, the grounds of suit must be different; second, each ground must be sufficient, as stated, to sustain a bill.

Testing the bill in this case by these principles, it is *Held* not to be multifarious.

Time is not of the essence of a contract for the sale of property, unless made so by express stipulation, or unless it may be implied to be so from the nature of the property, or from the character of the interest bargained, or from the avowed object of the seller or of the purchaser.

Applying these principles to the contract which forms the subject-matter of this suit; *Held*, that time was not of its essence.

IN EQUITY. This litigation arose from a creditor's bill, filed in one of the courts of Illinois, by Edward R. Knowlton against the City of Joliet Water Works Company, Jesse W. Starr and Harriet Brown, for the enforcement of a judgment against the first-named two defendants; for the appointment of a receiver of the property used by that company in its business; and for an accounting with the remaining defendant, Harriet Brown, who, it was alleged, asserted a vendor's lien upon some of the property of the Water Works Company, sold by her to Starr, and by him to that company.

The Guarantee Trust and Safe Deposit Company, a corporation of Pennsylvania, being made a defendant, the cause, upon its motion, was removed to the United States Circuit Court for the Northern District of Illinois, upon the ground of the diverse citizenship of the parties. Subsequently that company filed its cross-bill for a foreclosure of a mortgage held by it upon the property of the Water Works Company, and for specific performance by Harriet Brown of her contract of sale to Starr.

The cross-bill alleged, in substance, that by certain instruments in writing, bearing date, respectively, the 15th and 17th of June, and the 9th of October, 1880, Starr undertook with the city of Joliet to construct and maintain a system of water works for that city and its citizens, in consideration of which it agreed to grant to him and his successors certain franchises, rights and rentals connected therewith; that on the 4th of October, 1880, he entered into a written agreement with

Harriet Brown, by which, in consideration of $1000 to be paid to her, she agreed to convey to him a certain parcel of land in Joliet; that subsequently he entered into a verbal agreement with her for the purchase of other parcels of land, making, in all, 9.60 acres, for which he was to pay a total price of $4800; that on the 10th of December thereafter, Mrs. Brown, by warranty deed, conveyed all of said parcels to Starr, placing the deed in the hands of one Hobbs, for delivery to Starr, upon the payment of the balance of the purchase money; and that on the 3d of November Starr paid to her, on that purchase, the sum of $500, and on the 17th of February, 1881, the further sum of $1000.

It was also alleged, in the cross-bill, that immediately after said agreements, and with full knowledge and consent of Mrs. Brown, Starr took actual and open possession of all the premises so purchased, and immediately began to make permanent and expensive improvements thereon for water works purposes; that he and his assignee, hereinafter mentioned, continued to make such improvements at a cost of about $50,000, and remained in uninterrupted possession of the premises until they were delivered to the receiver appointed in this litigation; all this within the daily sight of Mrs. Brown, and without objection or molestation on her part; that to supplement his individual resources, which were insufficient to carry out his agreement with the city, Starr resorted to the plan of creating a corporation under the local laws of the State, and by means of its negotiable bonds and stocks raising money sufficient to complete said water works; and that to accomplish this purpose The City of Joliet Water Works Company was organized, with a capital stock of $200,000, of which amount Starr subscribed for $195,000 in his individual name.

It is further alleged in the cross-bill, that immediately upon the organization of that corporation, and on the 9th of December, 1880, Starr conveyed to it and its assigns his contracts with the city of Joliet, as well as the rights, franchises and property, real and personal, connected therewith, including the property purchased from Mrs. Brown, and agreed with the company to complete the system of water works contem-

plated by his contract with the city, and deliver them to the company within a reasonable time; that by the agreement last mentioned the company, Starr being a director and the principal manager, as well as the subscriber for all of its capital stock except $5000, agreed to credit him forthwith with $195,000 on his subscription to its capital stock, and to deliver to him its bonds to the amount of $140,000, par value, and also to secure their payment by executing to the complainant in the cross-bill a mortgage upon all the property, rights and franchises then owned, or thereafter to be acquired by it; that said bonds were accordingly delivered to Starr, and the mortgage was duly executed to the complainant in the cross-bill; that after getting the bonds in his hands he forthwith placed them upon the market, and they are now held by a large number of persons and corporations; that the Water Works Company has made default in the payment of the interest coupons due on said bonds, and for more than four calendar months has continued to make default; and that, in obedience to the request made to it, according to the terms of the mortgage, by a majority in interest of the holders of bonds, the complainant in the cross-bill, as trustee, files its cross-bill for foreclosure. The bill still further avers that, in consequence of the assignment of Starr to the Water Works Company and the execution of said mortgage, the trustee was invested with the right, upon the payment of the purchase money due to Mrs. Brown, with interest thereon, to demand of her a specific performance of her agreement with Starr; that, as such mortgagee, the Guarantee Trust and Safe Deposit Company has always been willing to perform the agreement of Starr and to pay his vendor the residue of the purchase money due to her, with interest, on having a proper deed of conveyance, and is still ready and offers to pay the said residue; and that the Water Works Company is hopelessly insolvent, having no property, except that covered by the mortgage. The bill prays for a foreclosure and sale; that the proceeds thereof, after paying certain fees and current expenses, may be distributed in payment of said bonds and coupons; that an account may be taken of the amount due on account of the purchase money

due to Mrs. Brown from Starr; and that she be decreed to specifically perform her agreements to convey, so that said mortgage shall be a valid and first lien on the property.

Mrs. Brown filed a demurrer to the amended cross-bill, alleging specifically that the same was multifarious. This demurrer having been overruled, she thereupon answered, averring her ignorance of the contracts between Starr and the city; admitting the entering into the written contract with Starr, but alleging that it was thereafter wholly and completely abandoned by him, and that neither he nor any person or corporation had ever offered or claimed the right to carry out that contract; admitting that he afterwards verbally negotiated for the purchase of a larger tract of land, but alleging that said negotiation, as a contract, was void, under the statute of frauds; that by its terms the payment of the entire purchase price was a condition precedent to the vesting in him of any title whatever; that the possession and the improvements were made without her consent, express or implied, and with his eyes open, and that she is entitled to the whole, augmented in value as it is by the improvements; that she had made a great many efforts to secure the balance of the purchase money due from Starr, but had been unsuccessful; that the negotiation and transaction, so far as he and those claiming under him or acting with him were concerned, had been a fraud upon her; that by reason of such failure on his part, and that of his successors and assigns, to comply with the terms of her contract with him, it had become broken, and was void; and that the amended cross-bill was multifarious; and praying the same benefit of her answer as if she had specifically demurred to the bill. To this answer a replication was filed.

Pursuant to a decree of the court on the 31st of March, 1883, upon the petition of John D. Paige, receiver, all the property and effects of the Water Works Company which it obtained from Starr, and all the rights accruing to it by virtue of the contract with Mrs. Brown, were sold, and bought by Joseph H. Foster, of Portsmouth, N. H. On June 9th, 1883, a decree of foreclosure was entered upon the cross-bill against the fund realized by the sale.

After some other proceedings, not necessary to be stated, a further decree was entered, August 12th, 1883, adjudging that there was justly due to Harriet Brown, on account of said purchase money of the premises sold to Starr, including interest, the sum of $3964, and that her said agreement with Starr be performed and carried into execution.

From this decree Mrs. Brown prayed and perfected the appeal which brought her case here.

*Mr. Charles A. Dupee* and *Mr. Monroe L. Willard* for appellants.

I. The cross-bill was multifarious.

The right to specific performance against Mrs. Brown was a question entirely distinct from any which could or did arise in the foreclosure of the mortgage. She was in no way interested in any of the questions between the mortgagee and mortgagor, or those claiming under it. That this is so, and that Mrs. Brown was not a necessary party, the proceedings in the case demonstrate. The property was sold by the master April 28, 1883, but, by express order of the court, only such rights and interests in the real estate as belonged to the Water Works Company and those claiming under it were so sold. On June 9, 1883, a decree of foreclosure was rendered, purporting to be upon the cross-bill and the several answers thereto, but in no way adjudicating the questions relating to Mrs. Brown. And these questions remained unadjudicated until August following. If Mrs. Brown was a necessary party, her rights should have been passed upon before any sale was made of the land. But they were not until some time after the final decree of foreclosure. We see no reason in principle, or in the proceedings in fact had, why Mrs. Brown's case should have been mixed up with the foreclosure; why the mortgagee should not, if it had a right to enforce Starr's contracts, have filed an original bill for that purpose. Such a bill could have been speeded as rapidly as the same questions in the foreclosure case. If it had no such right, then the decree in question should be reversed. 1 Daniell's Ch. Pl. and

Pr. 339, c. 6, § 4; Story's Eq. Pl. § 272; *Dial* v. *Reynolds*, 96 U. S. 340.

II. The right and title claimed by appellant were adverse and paramount, or at least prior to the interests of both mortgagor and mortgagee, and therefore appellant was not a proper party to the cross-bill.

The controversy in a foreclosure suit is not concerning claims of title paramount to the mortgagor, or adverse to him. It is a question regarding the validity of the mortgage and its amount. The object of the proceeding is to bar the equity of redemption of the person giving the mortgage, and those who have acquired rights under him inferior to the mortgage, and to convey to the purchaser under the decree the title mortgaged. It is not to give a perfect title, or to give him any better title than the mortgagor had, or even to determine whether he had any title at all. If it is proper to try title in a foreclosure suit, conversely it would be proper to try a foreclosure suit in an action to recover land. It would be immaterial whether it was the holder of the adverse title or the mortgagee who went forward. But "one suit cannot thus be injected into another." *Peters* v. *Bowman*, 98 U. S. 56, 60; Jones on Mortgages, §§ 1439, 1440, 1445. On the same principle, in a suit to foreclose a mortgage, made of land for the conveyance of which to him the mortgagor holds a bond, the vendor is not a proper party. He cannot be affected by the decree. *Pridgen* v. *Andrews*, 7 Texas, 461; *Dial* v. *Reynolds*, 96 U. S. 340; *Chapman* v. *West*, 17 N. Y. 125; *Tasker* v. *Small*, 3 Myl. & Cr. 63.

III. The evidence did not sustain the right to a decree for specific performance.

It is unnecessary to cite authorities for the well-known principles of law applicable to the rights of a suitor for specific performance. He must himself have been at all times ready to carry out his part of the contract, and must have done or offered to do everything imposed upon him by the same.

We believe the only real ground upon which the court can base a decision in favor of the bondholders is the fact that expensive improvements were made upon the premises. Did

the law permit them on that account to arbitrarily ignore Mrs. Brown's rights as they could not otherwise have done? Or should it have made them more than ever ready, willing and eager to observe those rights and do everything necessary to be done on their part to entitle them to a conveyance.

Finally, the decree is against the evidence for the reason that no tender was ever made to Mrs. Brown — and, until the filing of the amended cross-bill, not even an offer — and no excuse is shown for the neglect. *Doyle* v. *Teas*, 4 Scammon, 202.

*Mr. J. L. High* for appellees.

MR. JUSTICE LAMAR, after stating the case as above reported, delivered the opinion of the court.

It is contended by the appellant that the decree below should be reversed on the ground that the cross-bill is multifarious. In *Shields* v. *Thomas*, 18 How. 253, 259, this objection was urged against a bill, and in considering the objection the court say : " There is, perhaps, no rule established for the conducting of equity pleadings, with reference to which (whilst as a rule it is universally admitted) there has existed less of certainty and uniformity in application, than has attended this relating to multifariousness. This effect, flowing, perhaps inevitably, from the variety of modes and degrees of right and interest entering into the transactions of life, seems to have led to a conclusion rendering the rule almost as much an exception as a rule, and that conclusion is, that each case must be determined by its peculiar features."

So in *Gaines* v. *Chew*, 2 How. 619, 642, the court say : " In general terms, a bill is said to be multifarious, which seeks to enforce against different individuals demands which are wholly disconnected. In illustration of this, it is said, if an estate be sold in lots to different persons, the purchasers could not join in exhibiting one bill against the vendor for a specific performance. Nor could the vendor file a bill for a specific performance against all the purchasers. The contracts of purchase being distinct, in no way connected with each other, a

bill for a specific execution, whether filed by the vendor or vendees, must be limited to one contract. . . . It is well remarked by Lord Cottenham, in *Campbell* v. *Mackay*, 7 Sim. 564, and in 1 Myl. & Cr. 603, 'to lay down any rule, applicable universally, or to say what constitutes multifariousness, as an abstract proposition, is, upon the authorities, utterly impossible.' Every case must be governed by its own circumstances; and, as these are as diversified as the names of the parties, the court must exercise a sound discretion on the subject. Whilst parties should not be subjected to expense and inconvenience, in litigating matters in which they have no interest, multiplicity of suits should be avoided, by uniting in one bill all who have an interest in the principal matter in controversy, though the interests may have arisen under distinct contracts."

In that case the bill was filed against the two executors of the will of Daniel Clark, the heirs-at-law of his legatee, and the several purchasers of various pieces of property which had been sold off from the estate. The relief asked was an accounting in respect to the rents and profits of the several parcels, and for general relief, as the heir and devisee of Clark under a different testament. Under this state of facts, the court said, p. 643: " The right of the complainant, Myra, must be sustained under the will of 1813, or as heir-at-law of Daniel Clark. The defendants claim mediately or immediately under the will of 1811, although their purchases were made at different times and for distinct parcels of the property. They have a common source of title, but no common interest in their purchases. And the question arises, on this state of facts, whether there is misjoinder or multifariousness in the bill, which makes the defendants parties. . . . And the main ground of the defence, the validity of the will of 1811, and the proceedings under it, is common to all the defendants. Their interests may be of greater or less extent; but that constitutes a difference in degree only, and not in principle. There can be no doubt that a bill might have been filed against each of the defendants, but the question is whether they may not all be included in the same bill. The facts of the pur-

chase, including notice, may be peculiar to each defendant; but these may be ascertained without inconvenience or expense to codefendants. In every fact which goes to impair or establish the authority of the executors, all the defendants are alike interested. In its present form the bill avoids multiplicity of suits, without subjecting the defendants to inconvenience or unreasonable expense."

The case against one defendant may be so entire as to be incapable of being prosecuted in several suits; and yet some other defendant may be a necessary party to some portion only of the case stated. In the latter case the objection of multifariousness cannot be allowed to prevail. *Attorney General* v. *Poole*, 4 Myl. & Cr. 17, 31; *Turner* v. *Robinson*, 1 Sim. & St. 313; *Attorney General* v. *Cradock*, 3 Myl. and Cr. 85.

It is not indispensable that all the parties should have an interest in all the matters contained in the suit; it will be sufficient if each party has an interest in some material matters in the suit, and they are connected with the others. *Addison* v. *Walker*, 4 Yo. & Col. Ch. 442; *Parr* v. *Attorney General*, 8 Cl. & Fin. 409, 435; *Worthy* v. *Johnson*, 8 Georgia, 236.

To support the objection of multifariousness, because the bill contains different causes of suit against the same person, two things must concur: first, the grounds of suit must be different; second, each ground must be sufficient as stated to sustain a bill. *Bedsole* v. *Monroe*, 5 Iredell Eq. 313; *Larkins* v. *Biddle*, 21 Alabama, 252; *Nail* v. *Mobley*, 9 Georgia, 278; *Robinson* v. *Cross*, 22 Connecticut, 171.

Testing, now, the case at bar in the light of these authorities and their statements of the principle involved, it will be useful to get a clear view of the exact relations of the parties.

Assuming the statements of the cross-bill to be true, and the demands preferred by it to be meritorious, the objection of multifariousness, however presented, raises no question, save the technical one of an undue uniting of demands. The attitude of the parties is this: Mrs. Brown, by her contract with Starr, and by his agreement with the Joliet Water Works Company,

had become the trustee of the legal title for the benefit of the company.. Starr and the.company, on the other hand, owed the purchase money to Mrs. Brown. By his assignment to the company, only an equitable title was conveyed, for he had not a legal title; so the Water Works Company's mortgage to the Guarantee Trust and Safe Deposit Company was but the mortgage of an equity. Having no legal title itself, the mortgagor company could convey none to the mortgagee or the trustee. So, also, as to the other defendants to the cross-bill, the intervenors under the original bill, whatever may be in fact the exact measure and nature of their various rights, all are in common interested in the legal title held, as above stated, by Mrs. Brown. Indeed, as to all the parties to the cross-bill, and their respective demands, she holds the key to the whole situation, especially in view of the fact that the reservoir and engines are on the land in question.

Every defendant to the cross-bill, as well as the complainant therein, is directly interested in the calling in of the legal title. It will necessarily enhance the value of the property to be sold, not merely by the increase in value by the amount paid by the complainant under its tender, but also and to a greater extent by the settlement of the title. To paraphrase the language of the court in. *Gaines* v. *Chew, supra,* "In every fact which goes to establish the identity and value of the property sought to be sold" all the defendants are directly interested; not interested to the same extent nor in the same way, but still, in a substantial sense, interested in any decree which may be rendered

The case of *Dial* v. *Reynolds,* 96 U. S. 340, relied on by counsel for the appellant in this connection, and its cognate cases, are not opposed to this view. This is not an instance of an attempt, in a foreclosure proceeding, to call in and litigate an outstanding legal title. It is the only legal title in the field; it is that under and through which mortgagor and mortgagee equally claim.. To say that the alleged trustee of that title, because he chooses to deny the trust relation, can defeat the proceeding without an adjudication on its merits, and drive the mortgagee to a distinct and preliminary suit, is

to assume a position not supported by authority, and in the opinion of this court, not maintainable.

The appellant further claims that, as to Mrs. Brown, the case made out below was not such a one as calls for specific performance, and in support of this view relies on alleged unreasonable delay in the payment of the purchase money. The legal propositions applicable to this question are well settled in this court.

In *Secombe* v. *Steele*, 20 How. 94, 104, it is said: "Time may be made of the essence of the contract by express stipulation, or it may become essential by considerations arising from the nature of the property or the character of the interest bargained. And the principle of the court of equity does not depend upon considerations collateral to the contract merely, nor on the conduct of the parties subsequently, showing that time was not of the essence of the contract in the particular case. *But it must affirmatively appear that the parties regarded time or place as an essential element in their agreement*, or a court of equity will not so regard it."

In *Holgate* v. *Eaton*, 116 U. S. 33, 40, the court say: "In the case of *Taylor* v. *Longworth*, 14 Pet. 172, 174, Mr. Justice Story uses language which has since become a legal maxim in this class of cases. 'In the first place,' he says, 'there is no doubt that time may be of the essence of a contract for the sale of property. It may be made so by the express stipulation of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or the purchaser. And even when time is not, thus, either expressly or impliedly, of the essence of the contract, if the party seeking a specific performance has been guilty of gross *laches*, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period, been a material change of circumstances, affecting the rights, interests, or obligation of the parties; in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust.'"

Apply these principles to the contract between Starr and Mrs. Brown and what will be the result?

It was not even claimed that there was any express stipulation between the parties that time should be of the essence of the contract: nor, on the other hand, that such obligation arose from the nature of the property or the avowed object of the seller.

It is asserted that there was an understanding that Starr should have no right or title to the land, or the right to any conveyance of the land, until the full purchase price should be paid. But that is a very different proposition. It has relation to the security reserved, and not to the time of payment. It is true, that in his deposition of April 18, 1883, Hobbs, the agent of Mrs. Brown, states that Starr agreed to pay cash, and that such was "the basis of the contract." But no such claim was presented by the pleadings; and, moreover, Hobbs's testimony shows that there was an agreement for the postponement of the payment while Starr should go to Philadelphia; and, finally, in the same deposition, and in a subsequent one, he states that Starr had agreed to pay eight per cent interest on the purchase money, — a proposition manifestly inconsistent with the theory of appellant's insistence on a cash transaction. Without stopping to array them, it will suffice to say, that numerous matters in the record show, to the satisfaction of the court, that Mrs. Brown consented to Starr's delay of payment, reluctantly perhaps, but nevertheless consented. Even were it granted that time was of the essence of the contract, the conduct of Mrs. Brown would have been a waiver of that fact. Her acceptance of a partial payment of $1000, on the 17th of February, 1881, was certainly not a disaffirmance of the contract, but the contrary. So, again, her demand for performance on the 27th of November, 1881, shows very plainly that up to that day it had not been abandoned. Hobbs in his first deposition states that there was a subsequent demand made by him on Starr for the money; and his second deposition shows that he sought an interview with the attorney of the committee of the bondholders on the 26th of January, 1883, for the purpose of getting the money due to Mrs. Brown on the contract with Starr.

The answer of Mrs. Brown declares that the contract was

abandoned and cancelled in November, 1881, in Philadelphia. Even if she had the power so to do under the circumstances, still it was not done. The averments of the answer are not only not proved, but are even disproved by Hobbs himself. Hobbs was an officer of the Water Works Company. In his first deposition he gives this version of the transaction relied on in the answer. He says: "I got on the train and went to Philadelphia and told Mr. Starr we insisted upon the payment of that amount and others, and if it was not paid or absolutely provided for while I was there in the city for a day or so, that I should return to Joliét, and the understanding was that Mr. Knowlton and myself would withdraw from the company; Mr. Starr failed, after various plans he had made, to produce the money; he failed in furnishing it, and I returned, he following me back within a few days, and we then withdrew from the company."

The witness is here speaking, as elsewhere appears, of not only this debt, but also of the general liabilities of the concern. Subsequently to this, he still demanded the money from Starr. Pomeroy on Specific Performance, 395, 396; *Reynolds* v. *Nelson*, 6 Madd. 18, 19.

As between the appellant and the bondholders, represented by the trustee, it would be inequitable to refuse the consummation of her bargain.

*The decree of the Circuit Court is affirmed.*