HENDERSON et al. v. McFADDEN et al.

(Circuit Court of Appeals, Fifth Circuit. December 17, 1901.)

No. 1,096.

1. SALES—CONSTRUCTION OF CONTRACT—TIME OF PERFORMANCE.

In determining whether stipulations as to the time of performing a contract of sale are conditions precedent, the court seeks simply to discover what the parties really intended; and if time appears, on a fair construction of the language and under the circumstances, to be

of the essence of the contract, the stipulations in regard to it will be held conditions precedent.

**2. SAME—ACTION BY PURCHASER FOR BREACH—QUESTIONS FOR JURY.**

Plaintiffs contracted to purchase 1,500 bales of cotton. The contract was made by telegraph, plaintiffs making an offer, to remain open half an hour, which was accepted by defendants, who stated: "Come at once. We want the money out of it;" to which plaintiffs' agent replied: "Order cotton out at once unless it rains. Will be down soon as possible." He was then 18 miles distant, with trains running each day between the two places. During the next three days defendants repeatedly announced their readiness to deliver, and urged the agent to come and receive the cotton, but he did not come, and on the fourth day defendants notified him that they would not deliver the cotton. In the meantime the price was advancing. *Held* that, the contract being one between merchants, in which time is ordinarily of the essence, and the sensitive nature of the transaction appearing, the question as to what was the intention of the parties in reference to the time within which the contract was to be executed was one for the jury.

In Error to the Circuit Court of the United States for the Middle District of Alabama.

A. B. Foster, W. S. Reese, Jr., and J. Sternfeld, for plaintiffs in error.

Robt. L. Harmon and P. H. Dent, Jr., for defendants in error.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

McCORMICK, Circuit Judge. The defendants in error brought this action against the plaintiffs in error in the circuit court for the Middle district of Alabama, claiming and seeking to recover of the plaintiffs in error $5,000 damages for an alleged breach of contract to sell and deliver to the defendants in error 1,500 bales of cotton bought of them at Enterprise, Ala., at the price of 6⅞ cents, free on board, round, nothing below low middling, and subject to reweight. The fifth count, added as an amendment to the complaint, after stating the contract and the alleged breach, avers that after the defendants (the plaintiffs in error) had failed and refused to deliver the cotton, or any part thereof, to the plaintiffs (the defendants in error), they went into the market, and purchased 1,500 bales of cotton of a similar grade to the cotton purchased from defendants, at a loss to them of, to wit, one-half a cent a pound; that is to say, that by reason of the advance in the price of cotton they were required to pay, to wit, 7⅜ cents per pound for the cotton. Plaintiffs aver that they could not purchase the cotton at Enterprise, Ala., by reason of the fact that the cotton was not there, and could not be had, except this cotton which defendants had, and which they refused to deliver to plaintiffs, and sold to another person on November 25, 1899; and plaintiffs aver that they purchased the cotton, to wit, 1,500 bales, of a grade as nearly similar to the cotton which defendants refused to deliver as they could, and they aver that they purchased it as expeditiously and as cheaply as they could, and that they had to pay therefor, to wit, 7⅜ cents per pound; and they aver that in the purchase of the 1,500 bales of cotton they incurred expenses and rendered services reasonably worth 50 cents per bale, amounting to the sum of, to wit, $750;

and they aver that the expenses so incurred and services so rendered were necessary and unavoidable in order to procure the same. The plaintiffs in error pleaded, in substance, that the defendants in error had broken their contract, and that the plaintiffs in error had a right to rescind it, which they did. There were demurrers to the complaint and to the pleas and to the replications and motions to strike, all overruled. There were numerous objections to the introduction of proof overruled, which rulings of the court, so far as they were against the plaintiffs in error, were excepted to, and have been submitted in the assignment of errors, but we do not deem it necessary to notice the objections to these rulings.

Besides other evidence, which we do not deem it necessary to recite, the bill of exception shows that on the 15th day of November, 1899, John Gatling was at Elba, Ala., acting as the agent of the plaintiffs in the purchase of cotton, and on that day received in the due course of mail the following letter:

"J. E. & W. E. Henderson, Merchants and Bankers.

"Enterprise, Alabama, November 15, 1899.

"Mr. Jno. Gatling, Elba, Ala.—Dear Sir: As soon as you get through shipping your cotton over there, come over here, and stay with us. You have nothing over there to nurse, and there is about 1,500 or 1,600 bales here. We want you to come over and look at ours. It is much better ginned than the cotton you have been handling there, and if you will come over we will give you the preference when we sell.

"Yours, &c., J. E. & W. E. Henderson."

The witness Murphree, called by the defendants, testified on cross-examination:

"A telegram prior to November 20th, signed 'Jno. Gatling, Agent for McFadden Bros.,' was received at Enterprise at a time, according to my recollection, when neither of the defendants was there, and was received by myself. On the same day, or probably the next, I had a conversation with Mr. Gatling over the telephone. The telegram was signed 'Jno. Gatling, Agent for McFadden Bros.' The next day I had the conversation with him, and told him that Mr. Henderson was out, and would be in later in the day, and would confer with him. I was there in the store representing defendants at the time of this conversation with Gatling. My recollection is that I informed W. E. Henderson, and told him to go to the phone, and see if he could make a trade; but I don't think he could find him. I informed W. E. Henderson of having received a telegram and of having a conversation with Gatling. * * * I did not show that telegram signed 'Jno. Gatling, Agent for McFadden Bros.,' to W. E. Henderson, nor did I tell him how it was signed, nor did I so tell Mr. J. E. Henderson."

W. E. Henderson testified:

"Some time between the 15th and 20th Mr. Gatling asked me to come to the phone. I went to the phone. (The operator came for me, and said it was Mr. Gatling.) He didn't tell me who he represented. He said he heard we had a large lot of cotton for sale. I said 'Yes,' and we would be compelled to sell that cotton within the next few days, and to come to Enterprise, so he would be on the ground, so I could deliver promptly; that the reason we were selling this cotton was that we were compelled in our business to have the money, and I would either have to sell a lot of cotton in Savannah or Enterprise, and preferred selling the cotton in Enterprise, because I could take better care of it in Savannah. Enterprise is a small place, and we have not warehouses sufficient, and it is a hard matter to take

good care of cotton. The warehouses hold nothing like 1,500 bales of cotton. I wanted to and intended to sell the cotton at Enterprise. I explained to him it was for immediate delivery, and that his communications or offers to me must be considered that way, and any acceptance by me of his offer would be considered the same way. We must deliver the cotton at once, and we must have the money. Mr. Gatling said it was all right. He was in Elba, and would come immediately; and that, if he wired, I might consider his meaning to be 'immediately.'"

Gatling, for the plaintiffs, testified:

"I had a conversation with a person representing J. E. and W. E. Henderson over the phone while at Elba some time prior to the sale of the cotton. I don't know the date. It was prior to the 20th of November,—prior to the time I sent that telegram dated on the 20th at 10:20. He asked me, as near as I can recollect, what I would give him for the cotton. I made him an offer, and I don't know what he said, but that he didn't care to sell then, and would let me know in a few days. He said something about my coming down and staying at Enterprise with them. I said it was impossible, as I had a large lot of cotton at Elba that I could not leave. Nothing was said about the same being for immediate delivery,—about, if any offer was made by me, or sale made to me, that the cotton must be received and paid for at once, or immediately."

Omitting signature, address, and date, except the place from which sent and the hour, these are the telegrams which passed on November 20, 1899:

10:15 a. m., Elba: "Name lowest price f. o. b., round, nothing below low middling, to be reweighed. Answer quick."

3:50 (?) p. m., Enterprise: "Make us best offer you can our lot."

4:10 p. m., Elba: "Offer six seven-eighths f. o. b., round, nothing below low middling, subject to reweights. Answer immediately."

4:30 p. m., Enterprise: "How long will you give us on your offer?"

4:35 p. m., Elba: "Will give you half hour on limit."

4:45 p. m., Enterprise: "Squeeze your limit one-sixteenth. Will try to trade with you. The lot is at least one-sixteenth better than you are figuring on."

5 p. m., Elba: "Can't increase offer. Answer as soon as possible. Am expecting limit to be cut."

5:25 p. m., Elba: "Cannot offer more."

5:30 p. m., Enterprise: "1,500 bales of cotton is yours. Come at once. We want the money out of it, and the insurance stopped."

5:40 p. m., Elba: "Order cotton out at once unless it rains. Will be down as soon as possible. Confirm sale by letter."

November 21st:

9:35 a. m., Elba: "Soon as you get all cotton lined out ready for weighing and classing, wire George Beale here. I go to Brantley this evening."

1 p. m., Enterprise, to George L. Beale: "We are ready to deliver cotton."

(Hour not given.) Elba: "Will come down as soon as our weigher gets there to weigh cotton. Reweighing must not begin until he arrives."

Enterprise, letter to George L. Beale: "Dear Sir: We expect you tomorrow morning without fail, to commence receiving cotton. We are ready to deliver. We have good beams and government standard seal weights to test scales, and men to weigh it."

November 22d:

Enterprise, letter to George L. Beale: "We were disappointed that you did not show up here on arrival of train this morning. It costs big money to carry 1,500 bales of cotton, and we want to deliver it, and get our money out of it. Will certainly expect you to-morrow morning to get to work on it. Don't fail to come."

November 24th:

8:45 a. m., Elba: "Sorry to disappoint you. Impossible to come. Haven't finished shipping here yet. Communicate headquarters Montgomery. Perhaps they will send man."

10:20 a. m., Enterprise, to George L. Beale: "You have no cotton with us."

10:50 a. m., Elba: "Yours we expect to begin receiving cotton to-morrow sure."

24 (no other date), Elba: "Since wiring you this morning, have wire from Montgomery that weigher and crew be down on to-night train."

1:10 p. m., Elba: "Gatling bought 1,500 bales from you on the 20th. I have your letter acknowledging sale by saying cotton is ready to be delivered. Gatling promised to receive it in a few days. Time hasn't expired. We shall hold you to the sale. Crew will be down to-night to begin."

2:45 p. m., Elba: "What price will buy round lot 1,500 bales or less, nothing below middling, f. o. b.? Answer immediately."

3:25 p. m., Enterprise: "If you wish to buy cotton, make us offer. If offer satisfactory, we will sell it to you."

2:45 p. m., Montgomery: "We bought from you, through our agent, Jno. Gatling, on 20th, 1,500 bales cotton at six seven-eighths cents round lot, nothing below low middling, cotton to be reweighed. Plummer & Richardson have gone to Enterprise to receive cotton for us. Deliver same to them, and we will pay for cotton according to contract at Enterprise, or when you direct, upon receipt of same."

7:50 p. m., Montgomery: "We have been advised by our Mr. Plummer that you declined to deliver the 1,500 bales of cotton bought from you by our Mr. Gatling. We demand the cotton according to contract. Plummer & Richardson will remain there to receive it. We will pay you for same upon delivery. Answer."

8:05 p m., Enterprise, to James P. Ferrell: "We are not due you any cotton under contract."

It was agreed in this case that John Gatling, George L. Beale, and James P. Ferrell were the agents of the plaintiffs during the time from the 20th to the 25th of November, 1899, inclusive; that John Gatling and George L. Beale were at Elba, Ala., a distance of about 18 miles from Enterprise, where J. E. and W. E. Henderson were at that time; that on the 22d, 23d, and 24th George L. Beale was at Elba and J. E. and W. E. Henderson were at Enterprise; that James P. Ferrell was during these days at Montgomery, a distance of about 120 miles from Enterprise; that during these days there was running regularly every morning from Elba to Enterprise a regular passenger and freight train, which also ran in the afternoon or at night daily from Enterprise to Elba; and that Enterprise and Montgomery were also connected by passenger railway service, so that passengers could leave Montgomery one day and reach Enterprise the same afternoon. The proof all tended to show that the market value of cotton was higher on the 24th of November, 1899, than it had been on the 20th of that month. Numerous witnesses were examined and testified as to the price of cotton at different local markets in Alabama on November 24th, 25th, 27th, 28th, and 29th. Numerous witnesses also testified as to what was a reasonable charge per bale for purchasing cotton in the various local markets, ranging from 10 cents per bale to 50 cents per bale. There was also proof introduced as to the freight rate between these local markets and between each and Boston, Mass. The bill of exception shows all the evidence that was offered on the trial. We do not deem it necessary to recite it further than we have.

When the introduction of evidence had been closed, the plaintiffs requested the court in writing to charge the jury as follows: "Your verdict in this case should be for the plaintiffs, and the amount of your verdict should be five thousand ($5,000) dollars." The court thereupon gave that charge to the jury, as requested by the plaintiffs, and to this action of the court the defendants (the plaintiffs in error) excepted. The assignment of errors embraces 28 specifications. They mean substantially that the court erred in giving this instruction to the jury. Waiving all question as to the correct measure of damages in such a case, it is clear, and needs no citation of authority or effort at argument, to show that the direction to the jury to return a verdict for $5,000 was erroneous, and such error as requires us to reverse the judgment of the circuit court. Whether it was error to instruct the jury that their verdict should be for the plaintiffs requires more serious consideration. The vendor is not bound to make any delivery of goods to the vendee until the price is tendered. If no credit be given, the vendor is bound to deliver the goods immediately upon the request of the buyer with tender of payment. Story, Sales, § 303, citing Bloxam v. Sanders, 4 Barn. & C. 948. Time is not ordinarily deemed to go to the essence of a contract unless it is so expressly treated by the parties, or unless it naturally follows from the circumstances of the case. Story, Sales, § 310. In determining whether stipulations as to the time of performing a contract of sale are conditions precedent, the court seeks simply to discover what the parties really intended; and, if it appear on a fair construction of the language and the circumstances to be of the essence of the contract, the stipulations in regard to it will be held conditions precedent. Benj. Sales, § 593; Higgins v. Railroad Co., 60 N. Y. 557. In the contracts of merchants time is of the essence. Norrington v. Wright, 115 U. S. 203, 6 Sup. Ct. 12, 29 L. Ed. 366. In Duncan v. Topham, 8 C. B. 225, the declaration alleged an order for goods to be delivered to the defendant within a reasonable time, but the proof showed a written order for "five tons, etc.; but it must be put on board directly," to which the plaintiff replied, "I shall ship you five tons, etc., to-morrow." Held, that the proof did not support the declaration, and that "reasonable time" was a more protracted delay than "directly." In Attwood v. Emery, 1 C. B. (N. S.) 110, the agreement of the vendor, who was a manufacturer, to deliver goods as soon as possible, was construed to mean as soon as the vendors could, with reference to their ability to furnish the articles ordered, consistently with the execution of prior orders in hand. A written order by a cooper for a large quantity of iron hoops as soon as possible, sent on the 30th of November, was held to be reasonably complied with by tender in the February following. But in the later case of Engineering Co. v. McHaffie, 4 Q. B. Div. 670, this construction of the words "as soon as possible" was not adopted, and they were interpreted to mean within a reasonable time, with an undertaking to do it in the shortest practicable time. "By the words 'as soon as possible,'" said Cotton, L. J., "the defendants must be taken to have meant that they would make the gun as

quickly as it could be made in the largest establishment with the best appliances. The delay arose solely from the seller's want of a competent workman, and he was held liable for a breach of contract." Benj. Sales, § 687. In Toms v. Wilson, 4 Best & S. 442, it was held by the queen's bench, and in error by the exchequer chamber, that a promise to pay immediately on demand could not be construed so as to deprive the debtor of an opportunity to get the money which he may have in bank or near at hand. And Blackburn, J., said that, if a condition is to be performed immediately or on demand, that means that a reasonable time must be given, according to the nature of the thing to be done. Benj. Sales, § 709. There is no doubt that time may be of the essence of a contract for the sale of property; may be made so by the express stipulation of the parties, or may arise by implication from the very nature of the property or the avowed objects of the seller or the purchaser. Even when time is not either expressly or impliedly of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period, been a material change of circumstances affecting the rights, interests, or obligations of the parties, in all such cases courts of equity will refuse to decree any specific performance, upon the plain ground that it would be inequitable and unjust. Taylor v. Longworth, 39 U. S. 173, 10 L. Ed. 405; Holgate v. Eaton, 116 U. S. 40, 29 L. Ed. 538; Brown v. Trust Co., 128 U. S. 414, 9 Sup. Ct. 127, 32 L. Ed. 468. In ordinary cases, when a vendor has failed and refused to deliver to the purchaser the goods sold, the measure of damages for the breach of the contract, if the price has not been paid, is the difference between the agreed price and the market price at the time and place of delivery, with interest. Bell v. Reynolds, 78 Ala. 511, 56 Am. Rep. 52; McFadden v. Henderson (Ala.) 29 South. 644. The proof shows that the parties to the contract involved in this litigation were merchants dealing as buyers and sellers in cotton. The complaint avers that the contract was made on November 20, 1899, that it was breached four days thereafter by the plaintiffs, and that the complainants were thereby damaged to the amount of $5,000, the chief element of which damage was the change in the market value of the goods. From this the sensitive nature of the transaction clearly appears. The essential value of time as an element of this contract is also indicated by the telephone communication between the parties as that communication is testified to by W. E. Henderson. In conflict with this testimony is that of the witness Gatling. It is manifest on the face of the first telegram from Gatling to Henderson that there had been some communication between the parties between the date of that telegram and November 15th, the date of Henderson's first letter. Also the language in Gatling's telegrams, "Answer quick," "Answer immediately," "Will give half hour on limit," "Answer as soon as possible," "Am expecting limit to be cut;" and Henderson's telegram: "1,500 bales of cotton yours. Come at once. We want the money out of it, and insurance

stopped;" and Gatling's answer, 10 minutes later, saying: "Order cotton out at once unless it rains. Will be down as soon as possible,"—all tend to show the delicate character of the dealings, and the essential bearing of time thereon. Bearing it in mind that it was the duty of the court to discover what the parties really intended, and that if it appear on a fair consideration of the language and the circumstances to be of the essence of the contract, stipulations in regard to time will be held to be conditions precedent, and that in the practice of merchants time is of the essence, and the material conflict in the testimony of Henderson and Gatling as to the telephone communications between the parties, we are clear that in this case it was the duty of the court to submit to the jury, under proper instructions, the issue as to what was the intention of the parties in reference to the time within which this contract was to be executed.

The judgment of the circuit court is reversed, and the cause remanded to that court, with direction to award the defendants therein a new trial.

(Jan. 7, 1902.)

SHELBY, Circuit Judge. I concur in the reversal because I think the circuit court erred in directing the jury that the amount of their "verdict should be $5,000." I think that on the evidence the question as to the amount of the verdict should have been submitted to the jury.