ODBERT et al. v. MARQUET et al.

(Circuit Court, N. D. West Virginia. August 15, 1908.)

1. VENDOR AND PURCHASER — FRAUDULENT REPRESENTATIONS — MATTERS OF OPINION.

A claim for damages or abatement of purchase money for fraudulent representations in a sale of a coal mine and lands cannot be based on a statement by the seller that the vein underlying the land had no faults, where there was no means by which such fact could have been known, and such statement was necessarily merely one of opinion and known to be· such.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, §§ 53, 359.]

2. SAME.

Where, in a sale of a coal mine and lands, the vendor also agreed to turn over to the purchasers options which he held to purchase the coal under adjoining lands, representations made by him that there was a vein of coal underlying all of such lands, even if untrue, cannot be made the basis of a claim for damages by the purchasers, or for an abatement of purchase money, where he made no claim to have any special knowledge as to the fact, or to have made any examination.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, § 359.]

3. SAME—ABATEMENT OF PURCHASE PRICE.

Defendant sold to complainants the entire stock of a coal company which owned the coal under certain lands, and represented that the vein was continuous under such lands and of a uniform thickness of four feet, when it was in fact but three feet and three inches as defendant knew, or could have known, having sunk a shaft thereon. Held, that there was a failure of consideration to the extent of the difference in value of the vein as it was and as represented, and that complainants were entitled to a corresponding abatement of the purchase price still unpaid.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Vendor and Purchaser, § 359.]

4. SAME—LACHES.

The rule that a purchaser can only rescind a contract for the purchase of realty for fraudulent misrepresentations made by the vendor when he acts promptly on learning the facts does not apply when he merely seeks

an abatement of the purchase price, which claim may be asserted at any time before all the purchase money has been paid.

5. EQUITY—PARTIES—JOINDER OF COMPLAINANTS.

Complainants who, together and as a single transaction, purchased all of the stock of a coal company, which carried with it the title to coal lands, although they divided the stock between themselves and gave separate notes for their respective shares of the purchase money, may unite in a suit in equity against the vendor to enjoin a transfer of the notes, and compel an abatement therefrom on account of fraudulent representations made by him in regard to the property.

6. BILLS AND NOTES—RIGHTS OF INDORSEE—ESTOPPEL OF MAKER BY RENEWAL.

The makers of negotiable notes, who, after such notes had been purchased from the payee by a bank, sought and obtained renewals from the bank, giving new notes and taking up the old, are estopped as against the bank to set up the defense of failure of consideration on account of fraudulent representations made by the payee.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 7, Bills and Notes, § 356.]

## In Equity.

S. H. Odbert, Jr., and George T. Odbert, in August, 1906, filed their original bill in this court against William Marquet, and some months afterwards, by leave of court, they, with W. H. Warner and H. S. Odbert, Sr., joined as plaintiffs, filed an amended and supplemental bill in the cause against said William Marquet and the First National Bank of New Cumberland, in which bill the plaintiffs allege themselves to be citizens of Ohio, the defendant Marquet to be a citizen of West Virginia resident in this district, and defendant bank to be a corporation under the national banking laws, having its principal place of business in New Cumberland, in this state, and district; that on September 11, 1902, plaintiffs purchased from defendant Marquet 2,000 shares of the stock of the Marquet Coal Company, a West Virginia corporation, at the price of $54 per share, or $108,000; that said stock so purchased was divided between and held by plaintiffs, 360 shares by W. S. Odbert, 320 shares by H. S. Odbert, Jr., 320 shares by Geo. T. Odbert, and 1,000 shares by W. H. Warner; that the capital stock of the company was $50,000 divided into 2,000 shares of par value $25 each, and by said purchase they became the owner of all thereof; that at the time of purchase of this stock there existed a deed of trust upon the property of this company for $25,000 in favor of F. W. Stewart, assignee of John A. Campbell, of which sum plaintiffs paid $15,000, leaving $10,000 unpaid, but not yet due; that plaintiffs assumed to pay off and discharge this trust debt as it should become due; that at the time of plaintiffs' purchase of this stock defendant Marquet owned the property of the Marquet Coal Company for which company a certificate of incorporation had been obtained, but the stock thereof had not been issued, nor had the property been conveyed to it by Marquet; that issue of stock and conveyance of the property was made after sale to plaintiffs; that for said purchase-money consideration H. S. Odbert, Sr., paid certain sums in cash and executed certain notes, payable in one, two, three, and four years, bearing 5 per cent. interest, to defendant Marquet, payable at the First National Bank of Cleveland, Ohio, and Geo. T. Odbert and H. S. Odbert, Jr., respectively, did likewise, while plaintiff Warner executed certain other notes payable in one, two, three, four, and five years, payable with 5 per cent. interest at the Colonial National Bank of Cleveland, Ohio; that the plaintiffs at the time of purchase transferred to Marquet the said H. S. Odbert 220 shares, H. S. Odbert, Jr., 240 shares, Geo. T. Odbert 240 shares, and W. H. Warner 700 shares, of said stock as collateral to secure the payments of said purchase-money notes due from each, respectively, and subsequently H. S. Odbert, Jr., and Geo. T. Odbert, renewed their notes, and each transferred 80 additional shares of the stock as additional security; that the property of said coal company consists of the coal underlying 192 acres of land, also under a tract of 40 acres and the surface of some 60 acres, with buildings and improvements, in Hancock county, W. Va., the tipples, tramways, buildings, machinery, horses, mules, carts, tools, and appli-

ances of all kinds used by the company in mining coal, and a railroad extending from the tipple and mines about two miles to the Pittsburg, Cincinnati, Chicago & St. Louis Railway at New Cumberland, with its locomotives, cars, etc., used in transporting said coal.

It is then charged in said bills that defendant Marquet in selling said stocks to plaintiffs made false representations, knowing them to be false, touching the property of said coal company; that he represented that the title to the property was good and unincumbered, when, in fact, the railroad was in fact located upon land for which said coal company had no title whatever; that it is located upon lands of Mary A. Stewart, Stewart Bros., and E. D. Stewart for a distance of one mile without any right or title, and the loss of such railroad, it is charged, would render the property almost valueless; that Marquet, knowing it to be false, represented that the coal was continuous, that it ran up and over the hills, did not run out, and that there was but one "horse back" on the property, while in fact there are over 100 such on it; that a shaft had been sunk upon the property, and thereby it had been ascertained that the coal seam was four feet in thickness, when in fact it was only three feet three inches, he knowing at the time that a seam of three feet three inches could not be profitably mined there; that he had options on 600 acres of adjoining property which he had turned over to the company and that the coal extended under these 600 acres, when in fact little or no coal extended under these 600 acres as was known by Marquet.

It is then charged that plaintiffs had no personal knowledge of the facts set out, that they relied solely upon the representations of Marquet, who represented these facts falsely to them, knowing them to be false; that said Marquet having given notice to said H. S. Odbert, Jr., and George T. Odbert of his purpose to sell the shares of their stock held by him as collateral on August 20, 1906, at public auction, they on August 13, 1906, presented to this court the original bill herein, and secured a temporary restraining order against such sale and pending a hearing, which was continued on the return day in September, the defendant the First National Bank of New Cumberland instituted at October rules, 1906, in the circuit court of Hancock county, W. Va., a suit in equity against the Marquet Coal Company, the plaintiffs, and others, alleging it to be the holder of said notes and shares of stock transferred to Marquet as collateral and praying that a receiver be appointed for said company, and the said stocks be sold to pay said notes. It is then specifically charged in the amended and supplemental bill that the defendant bank was not an innocent purchaser of said notes and stocks, for shortly after the purchase of the property one of the plaintiffs, taking with him a witness, had notified the cashier of said bank not to discount or purchase said notes or any of them, informing him that the property had been misrepresented, and that payment of the notes would be resisted. An injunction was prayed in the original bill against the sale and disposition of the stock and notes by Marquet and in the amended bill against the prosecution of said equity suit, that the damages and loss sustained by reason of the false representations made by Marquet be ascertained and decreed to plaintiffs, and general relief be granted them.

Restraining orders were granted, and to these bills the defendants Marquet and bank have filed separate answers. In these answers the sale of the stock at the price named in the bill and the execution of the notes therefor are admitted, but all allegations of fraudulent misrepresentations by Marquet as to the property are denied. It is also denied that the title to the railroad is defective or bad, or that the plaintiffs were without full knowledge of the condition and extent of the property and of the seam of coal. It is charged that the bank discounted the notes before due in regular course of business, and without knowledge of any claim of offset or defense by reason of fraud or misrepresentation as charged.

In addition to filing its answer, the bank, by leave, filed its cross-bill, in which it sets forth its ownership of certain notes of the plaintiff Odberts and Warner and of the stock of the coal company as collateral, and charges that the Odberts and Warner have been operating the mines of the company, have removed large quantities of coal and thereby depreciated largely the value of the property; have improperly operated the mines, to its great injury, so that the value of the property has depreciated from $100,000 to $40,000; and

that they are negotiating a sale of the two miles of railroad in order to interfere with and prevent a sale of the property. It is prayed that an injunction be granted against such sale of the railroad, and that a receiver be appointed to operate the property. The injunction prayed for in this cross-bill was granted, and the application for receiver was continued from time to time at the instance of the parties. The Odberts and Warner filed their joint answer to this cross-bill, in which they deny that they have improperly operated the mines, and, on the contrary, charge these mines to be in first-class condition, as shown by the reports of the state mine inspector. They deny that the property has depreciated in value; but, on the contrary, charge that they have spent $40,000 in improvements placed upon it, and have purchased and added to it coal under adjoining lands almost equal in amount to that mined by them, and have improved and equipped mines and railroad until they are in first-class order. They deny that they have been seeking to sell the railroad, that Marquet had any authority under the agreement to sell or convey to the bank the stock certificates pledged to him as collateral, and charge that the sum of about $32,000 due upon the unpaid notes will not be sufficient to indemnify them the damages sustained by them by reason of the false and fraudulent representations made at the time of sale by Marquet, whom they charge to be insolvent. Marquet filed his answer to this cross-bill, admitting all of its allegations to be true, and joining in the prayer thereof. Replications to all these answers to the original and cross-bills were entered and depositions were taken. Pending the taking of these depositions, the bank sued out an attachment in its equity suit pending in the state court based upon an affidavit of its president and Marquet against funds due the Odberts and Warner, whereupon a petition was filed by them, a rule issued against the bank, its president, and Marquet. Answer was filed thereto by them, affidavits were filed, a hearing was had, and the bank, its president, and Marquet held to be in contempt of the injunction awarded plaintiffs, and they were required to dismiss said attachment and pay the costs of the rule, which they did.

Reese Blizzard, Oliver S. Marshall, and John Marshall, for plaintiffs.
J. B. Somerville, H. M. Russell, John A. Campbell, and J. R. Donehoo, for defendants.

DAYTON, District Judge (after stating the facts as above). Very many difficult and perplexing questions have been raised in this case which have been very ably argued. The evidence is not clear, and upon every material point is conflicting. It has therefore been with great difficulty, and only after long consideration, that I have been able to determine its weight and effect. The plaintiffs charge that Marquet represented the title to the railroad to be good, or that he would make it good. On the other hand, Marquet insists that this railroad was taken in the sale after plaintiffs had had its title examined for themselves by an attorney of their own selection, who reported to them title to it to be good. It seems from the evidence that this railroad runs from 2 to 2½ miles from the main line of the Pittsburg, Cincinnati, Chicago & St. Louis Railway at New Cumberland to the Marquet Coal Company mines; that for about three-fourths of a mile it runs through the lands of the Stewarts, from whom no right of easement or way in writing has ever been obtained. This railroad is not incorporated as such, is not a public carrier, but was built by Marquet for the sole purpose of transporting coal from the mines to the main line. It cannot apparently, from the evidence, exercise the right of condemnation, and, if its right of easement over this three-fourths of a mile through the Stewart lands should be interrupted, it would render it useless for the purpose for which intended, and would unquestion-

ably greatly damage the plaintiffs. Marquet insists, first, that he was allowed by the Stewarts, acting through one of their number, to have this right of way over the lands upon terms and conditions which he fully complied with. This is denied by Stewart, who testifies that the terms and conditions were not complied with, but special damage was done the lands by the road's construction, allowed to be made only with the understanding that the conditions would be complied with, and that suit for damages or ouster is contemplated. Marquet insists, second, that in the sale there was no warranty, express or implied, of title to this railroad, but, on the other hand, plaintiffs took it as it was and with the rights it had. Plaintiffs, as stated, deny this. In weighing this testimony, it seems to me that two facts undisputed must be given especial consideration: First. At the time this railroad was built by Marquet, he and one of the Stewarts, acting for all, did attempt to execute some kind of a written contract touching this right of way, employing a lawyer for the purpose. Plaintiffs have introduced the contract so prepared by the attorney as they claim, but Marquet denies ever having seen this particular writing and that it contains the true conditions for the easement. It is undisputed, however, that, while an effort was made to settle the matter by a written contract, no such contract was ever executed, and it seems to me that the presumption arises from this fact that the evidence of Stewart is true that no settlement for this right of way has ever been made, and that, therefore, it is being used simply at the will of the Stewarts, not by legal right, and may be by them at any time interrupted and denied. It has certainly not yet, in point of time, become a fixed right by prescription, user or statute of limitation. Second. It is to be remembered that originally Marquet sold to the plaintiffs the coal property substantially alone for $60,000 and retained the railroad; that after so doing, becoming dissatisfied, he went to these plaintiffs, and sought to secure a rescission of this contract, by reason of which action on his part negotiations were opened inter partes which resulted in a new contract whereby plaintiffs took over all the property, including the railroad, at $108,000 and its transfer to plaintiffs was effected by an assignment of all the stock of the company, 2,000 shares, at a price more than double their par value. From this it would seem clear that substantially this railroad was valued in the transaction at something near or over $40,000, which would appear to be its full value. This being so, it is hardly conceivable that these plaintiffs would pay such price with a third of the whole line held merely by license and not by right and title without doing so either through ignorance of the facts or by reason of a guaranty that this title would be made good.

It is further insisted that Marquet made certain misrepresentations, in the course of the negotiations, touching the quantity and quality of the coal property, which induced plaintiffs to purchase at a price far in excess of its value and of the sum they would have been willing to pay had they not been misled by such misrepresentations. Touching the quality of the coal, it is alleged that Marquet represented it as containing only one "horse back" or fault, when, in fact, the vein was broken and intermixed with very many clay veins, faults, or "horse backs." It is also insisted that the mines at the time were in bad

condition, especially in the particulars of ventilation and drainage. I do not believe plaintiffs can base a claim for damage or abatement of purchase price on these grounds for these reasons: First. There is absolutely no way of determining, so far as I can learn from the testimony, from either an examination of the exterior surface of the land or from an examination of the mine where the coal has been worked out, when these horse backs, faults, or clay veins may appear in the vein yet to be mined They seem to be wholly irregular, and governed by no usual or natural conditions or laws. They are not persistent, are different in size and extent, and usually cover small areas. Therefore any representation made by Marquet could be only based upon opinion and desire by which the plaintiffs could not in the nature of things be deceived or misled. Touching the condition of the mines, it is clear the plaintiffs could and did inspect them before purchase, and took them without objection at the time.

It is further insisted by plaintiffs that Marquet claimed to have and agreed to turn over options upon 600 acres of coal underlying adjoining tracts which he represented to be underlaid with coal, but which turned out to be valueless because not so underlaid. This it is insisted was an inducing cause for purchase, and constitutes a just claim for abatement. While having grave doubt in the matter, I am inclined to the belief that such claim cannot be maintained. Marquet had no interest in these options other than the right to buy the coal at the option price. It could not be presumed by plaintiffs that he had any special knowledge touching the quantity or quality of coal underlying these optioned lands, unless he represented himself to have made special examination thereof, which the evidence nowhere shows he did. Finally, it is charged that Marquet represented that the coal underlying the two parcels of land, which under the sale of the stock passed to plaintiffs was continuous, run over the hills and underlaid all the land. I think the evidence preponderates in favor of plaintiffs' contention that such representation was made. What, then, was the effect of it? To find a true answer to this is a very perplexing question. The effect of fraudulent misrepresentations generally as affecting contracts for the sale of realty in this state is most thoroughly considered and determined by the encyclopedic opinion of Judge Green in Crislip v. Cain, 19 W. Va. 438, and in Wamsley v. Currence, 25 W. Va. 543. The general subject of such fraudulent misrepresentations as affecting contracts in general will be found in a note to Fargo G. & C. Co. v. Fargo G. & E. Co., 37 L. R. A. 593. The case of Development Co. v. Silva, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678, is also very interesting as applying the law in such case to a sale of a silver mine. None of these cases, however, give an exact solution of the question involved here. On one hand, it is claimed that no man can see under the ground and determine whether a vein of coal is continuous or not; that no one can tell, for a like reason, whether the vein will maintain its uniform thickness; that, therefore, any expression of opinion to the effect that it is continuous and uniform cannot be fraudulent, although it turn out untrue, cannot mislead, and therefore cannot be cause for abatement. In such case the purchaser buys at his own risk. On the other hand, it is contended

with great earnestness that these veins of coal are generally uniform; that the general dip or inclination can generally be pretty accurately determined, and that after years of mining in a particular vein in a given locality its peculiarities can be pretty thoroughly fixed and determined; that under such circumstances, when Marquet represented this vein to be continuous, to run over the hills, and to be at all points four feet at least in thickness, they had right, from his years of study and work in the vein, to rely upon this representation, and clearly, if they had not done so, they would not have purchased.

I am inclined to take an independent view from either of these. Coal has uniformly been held to be realty. It has been uniformly held that equity will abate the purchase price for a tract of land which has fallen short in acreage where the contract is a sale by the acre. In Fulton v. Shackleford, an action at law brought for the purpose of recovering back purchase money paid for coal supposed to be under lands which turned out to have none of merchantable quality under them, while filing no written opinion, I held that the plaintiff, Fulton, was entitled to recover, and that, when a party undertook to sell coal under land, the burden was upon him to show that it was there and in merchantable quantity, and, if it was not, that there was a failure of consideration to the extent of its absence. This was in a case where the supposed coal was sold by the acre, and an attempted survey of it had been made from surface indications. The judgment in this case upon appeal has been recently affirmed per curiam by the Circuit Court of Appeals, no opinion being rendered. In this case no direct sale of the coal was made, but I am constrained to believe that the stock of this company was purchased solely in consideration of the coal supposed to underlie the two tracts of 192 and 40 acres, and that the vein so underlying these tracts was assumed to be continuous and of at least four feet in thickness; that Marquet knew, or could have known, of the shaft sunk on a part of the land showing that it did not exceed three feet three inches. He was using this shaft as a well to supply water, and before making representations as to the thickness of the vein he could have easily ascertained by a proper investigation the fact. There can be no question but a difference of nine inches in a thin vein of four feet over any considerable part of the territory would very greatly diminish the value of the property both because of the loss of coal, and because of the increased expense incurred in mining the residue. Taking the general estimate of 1,000 tons for every foot thick per acre, it will be seen that these nine inches would represent some 750 tons loss to each acre so deficient. There is nothing in the evidence to disclose the increased cost of mining the residue. I am inclined to believe that, upon a reference, these facts can be fairly ascertained, and that plaintiffs are entitled to claim for the amount necessary to be expended to secure a good title to the railroad and for the lack of coal and reasonable increased cost for mining and for these items only.

But it is insisted most earnestly that plaintiffs have lost all right to these claims by reason of their laches and direct acts of acceptance of the present conditions as they are, and not as represented to be. There can be no question but what this would be true if plaintiffs were seeking to rescind the contract. When one seeks to rescind, he must act

promptly and apply for the relief so soon as he learns of the false representations or failure or part failure of consideration; but I do not understand this rule to apply where abatement alone is sought. The rule and practice in this state is clear that such claim can be made at any time before all purchase money is paid, and such claim is usually allowed out of the last installment of purchase money.

Again, it is insisted that this suit is multifarious, and cannot be maintained because it combines the several claims for such abatement of Warner and the three Odberts. This would be true possibly if this had been a sale of distinct and several interests in lands or coal made to each by several conveyances, but it was not. It was, in effect, the sale of all stock of the corporation for the consideration of the conveyance as a whole of the coal under the two tracts. It is not indispensable that all the parties to a suit in equity should have an interest in all the matters contained in the suit. It will be sufficient in order to avoid the objection of multifariousness, if each party has an interest in some material matters in the suit, and they are connected with the others. Brown v. Guarantee Trust Co., 128 U. S. 403, 9 Sup. Ct. 127, 32 L. Ed. 468. See, also, Hornor-Gaylord Co. v. Miller & Bennett (D. C.) 147 Fed. 295, and cases cited.

The final question to be considered is the rights of the First National Bank of New Cumberland in the premises. It is undisputed that, in consideration of the sale of the stock, these plaintiffs executed a number of negotiable notes to Marquet which have been discounted to this bank. It is insisted by them that one of their number in the presence of a witness notified the cashier not to discount or have anything to do with these notes because there would be trouble about them. The cashier testifies, in effect, that this conversation related to a claim at the time being asserted by one Allen against Marquet which Marquet settled, and afterwards these notes now in controversy were discounted by the bank. There may have been a misunderstanding between the parties of this kind, but, be that as it may, I think plaintiffs' contentions in this particular must fail for two reasons: First, because from the evidence I do not deem the notice given as specific enough; and, second, because it is undisputed that these plaintiffs, after it was given and after the original notes had been given, sought and obtained from the bank several renewals with new negotiable notes which would estop in my judgment any such defense so far as the bank, a holder for value, is concerned.

I therefore reach the conclusion that the bank is entitled either to a decree for the full amounts of the notes held by it, or to a dismissal from this suit without prejudice to its right to prosecute any independent action to recover the same as its counsel may determine may be for its best interests. So far as the appointment of a receiver for the corporation's property is concerned, it does not appear that these plaintiffs are insolvent, but, on the contrary, it seems to me that they are able to respond to a personal judgment. If counsel determine that such judgment shall be taken by decree in this cause, I will continue the motion for receiver for a reasonable time to allow such payment to be made, and, if not made, will then determine the motion for receiver. I further conclude that as against Marquet the plaintiffs are

entitled to a decree for damages in the nature of abatement of purchase money for the items hereinbefore set forth, which sum in abatement, if the parties cannot agree upon, must be arrived at by reference to a special master.