NATIONAL BANK OF SAVANNAH v. KERSHAW OIL MILL et al.

(Circuit Court of Appeals, Fourth Circuit. November 7, 1912.)

No. 1,101.

1. FRAUD (§ 21*)—FALSE REPRESENTATIONS — LIABILITY — PRIVITY OF CONTRACT.

Privity of contract is not essential to entitle a plaintiff to recover in an action of deceit for false representations.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 9, 10, 23; Dec. Dig. § 21.*]

2. FRAUD (§ 21*)—ACTION OF DECEIT—FALSE REPRESENTATIONS—LIABILITY TO THIRD PERSONS.

Defendants shipped to a dealer in cotton a large number of bales of linters, which are the product of a second ginning of cotton seed and worth in the market about one-third the price of cotton. At the request of the purchaser, they caused the shipment to be designated in the bills of lading as cotton, and indorsed such bills in blank and forwarded them to the purchaser, attached to drafts, which were paid. On obtaining them the purchaser pledged them with plaintiff bank as collateral for a loan, at an agreed value, as representing cotton, and by reason of the smaller value of the linters plaintiff suffered a loss. *Held*, on the evidence, that defendants were chargeable with knowledge that the purchaser desired the false statement made in the bills of lading for some fraudulent purpose, and that, also knowing that such bills were ordinarily used as negotiable instruments, they were liable to any one injured thereby in an action of deceit; also that they were liable on the principle that where one of two innocent persons must suffer on account

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of the fraud of another the loss must fall on him whose conduct enabled such third person to commit the fraud.

[Ed. Note.—For other cases, see Fraud, Cent. Dig. §§ 9, 10, 23; Dec. Dig. § 21.*]

Keller, District Judge, dissenting on the facts.

In Error to the District Court of the United States for the District of South Carolina, at Columbia; Henry A. M. Smith, Judge.

Actions at law by the National Bank of Savannah against the Kershaw Oil Mill and against the Lancaster Cotton Oil Company, respectively. Consolidated and tried together. Judgments for defendants, and plaintiff brings error. Reversed.

Benjamin F. Martin, of Greenville, S. C., and William Garrard, of Savannah, Ga. (Garrard & Gazan, of Savannah, Ga., and McCullough, Martin & Blythe, of Greenville, S. C., on the briefs), for plaintiff in error.

E. D. Blakeney, of Kershaw, S. C., and Thomas J. Kirkland, of Camden, S. C., for defendants in error.

Before GOFF and PRITCHARD, Circuit Judges, and KELLER, District Judge.

PRITCHARD, Circuit Judge. These suits were instituted in the United States District Court for the District of South Carolina by the plaintiff in error (hereinafter referred to as plaintiff) against the defendants in error (hereinafter referred to as defendants) to recover against the Kershaw Oil Mill the sum of $13,094.04, besides interest thereon at the rate of 7 per cent. per annum from January 6, 1911, and against the Lancaster Oil Mill the sum of $11,664.12, besides interest thereon at the rate of 7 per cent. per annum from January 6, 1911. The two cases were tried together. The learned judge who tried these cases in the court below, in referring to the facts, said:

"The concern of J. H. C. All & Son carried on business in the city of Savannah. They were purchasers and dealers in cotton, and had large financial transactions with the plaintiff, the National Bank of Savannah. In the course of these transactions they borrowed large amounts of money from that bank, which were secured by deposits with the bank, as collateral, of cotton, represented largely at different times by the bills of lading, or by other evidences of existence and ownership of that article by All & Son.

"During the year 1910 large amounts were borrowed in this way in the course of their business, and secured in the manner stated, and on the 28th of June, 1910, they made a loan from the bank, as of that date (although in continuance of previous loans), of $60,000. Whether it was in continuance of previous loans or not, it was an extension, as valid for all purposes of the transaction between the two parties as if it were a new loan of that date. This loan was secured by the deposit of bills of lading for cotton aggregating 1,171 bales, 662 bales of which were the bales represented by the bills of lading involved in the actions now before the court. It turned out afterwards that these 662 bales, although represented on the bills of lading as cotton, were in fact what are known as linters; that is, cotton ginned from the cotton seed after the ordinary article known as cotton had been first ginned off, and the seed sold, or turned over to the cotton seed oil mills, who, by a further and closer ginning, denude the seed more thoroughly of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

its attached lint, and which product, when so derived, is known as linters. There is a well-known difference in commercial recognition and language between cotton and linters, and the difference in value between the two, as a rule, is very great, although it has been testified that the very lowest grades of the article known as cotton nearly approximate the value of the highest grade of the article known as linters. In making this loan the bank accepted these bills of lading as and for the representatives of so many bales of cotton, lending money upon the valuation based upon the acceptance of a bale of cotton, by an arbitrary average value, according to the market rates of price prevailing that year, less certain margins retained by the bank for security, so as that these bales in the case of this loan were actually hypothecated in the bank at the value, upon an average, of between $50 and $51 per bale; whereas, had they been accepted as linters, according to the prices then prevailing, they would have been of a value not exceeding one-third of their value as cotton. These linters had been shipped to the firm of J. H. C. All & Son by the defendants in these particular cases. They had been purchased by All & Son, and were shipped to them according ‘to the usual methods, on draft for the purchase price with the bills of lading attached. The drafts were upon All & Son, and were for the price of the articles as linters at an average of 4½ cents a pound, or thereabouts, and not for the price of them as articles of cotton.

"Upon the presentation of the draft All & Son paid the drafts, but not apparently through the Savannah National Bank. That bank, the plaintiff in this case, had no knowledge of the amount or character of the drafts. Having paid the drafts and so acquired possession of the bills of lading, and thereby the ownership of the articles specified in the bills of lading, All & Son hypothecated the bills of lading with the plaintiff bank for this loan in the manner stated. In so doing All & Son secured from the bank a credit by the way of cash or its equivalent on these bills of lading, on the basis of their representing cotton, of about three times what they would have been entitled to upon the basis of their representing linters, and in so doing All & Son perpetrated upon the National Bank of Savannah an unquestioned fraud. The position of the plaintiff, the National Bank of Savannah, now is that, it having in good faith advanced to All & Son an amount based upon these bills of lading as representing cotton, they were justified in so doing on the ground that the bill of lading was a quasi negotiable instrument, well known in commercial use for the purpose of either sale or hypothecation, and they had a right to rely upon the statement of the shippers and consignees in those bills named, to wit, the defendants in these actions, that the articles named in the bills of lading were truly described to the extent that they were described; that is to say, that they had a right to rely upon the bills of lading as containing the representation of the shippers and consignees that this article was cotton, no matter what grade it may have been classed as cotton, yet to the extent of its description, however brief, in this bill of lading, they had a right to rely upon it."

At the conclusion of the testimony the court below directed a verdict in favor of the defendants, upon the ground that, notwithstanding the fact that defendants had caused to be issued bills of lading which were false and so known by them, yet, inasmuch as it could not have been reasonably foreseen that J. H. C. All & Son would negotiate these bills of lading with or hypothecate them to a third party, the damage which the plaintiff sustained was not a proximate result of fraud on the part of the defendants; and that they were therefore not liable.

This is an action of deceit, and the principal question for our consideration is as to whether, under the facts, the plaintiff· is entitled to recover the amounts alleged to be due in the bills of complaint.

That in both of these cases the oil mills, acting upon the suggestions and request of J. H. C. All & Son, procured the carrier to issue bills of lading for "cotton," notwithstanding the fact that such mills had full knowledge of the fact that the bales in question contained what is known as "linters," is well established by the evidence and found as a fact by the court. The fact that at the time the bills of lading were issued cotton was worth 14 or 15 cents per pound, and linters were only worth from 3½ to 4 cents per pound, among other things, strongly tends to prove that such representation was false and fraudulent. Such action on the part of the mills constitutes a fraudulent representation of a subsisting fact. Therefore, does the conduct of the defendants in procuring bills of lading of a commodity to be placed upon the market in the manner aforesaid bring this case within the rule where one who places an article upon the market, accompanied by a false and fraudulent representation of facts, with knowledge of their falsity, thereby commits an act from which it may be inferred that it was the intention of such party that the same should be acted upon, thus rendering the party making such false and fraudulent representation liable to the one who is injured thereby?

However, it is insisted by counsel that there was no intent on the part of the defendants, at the time the bills of lading were secured, that the misrepresented facts should be acted upon by the plaintiff, inasmuch as at the time the bills of lading were procured the defendants had no knowledge that the bills of lading were to be hypothecated with the plaintiff.

In the case of Claflin v. Commonwealth Insurance Company, 110 U. S. 95, 3 Sup. Ct. 515, 28 L. Ed. 76, Mr. Justice Matthews, in speaking for the court, among other things, said:

"No one can be permitted to say, in respect to his own statements upon a material matter, that he did not expect to be believed; and if they are knowingly false and willfully made the fact that they are material is proof of an attempted fraud, because their materiality, in the eye of the law, consists in their tendency to influence the conduct of the party who has an interest in them, and to whom they are addressed. * * *"

Also, in the case of Munroe v. Gairdner, 3 Brev. (S. C.) 31, 5 Am. Dec. 532, the court said:

"An intention to deceive is material; but if the falsehood asserted or imposed is, in its nature or character, calculated directly to defraud and injure some one in particular, or all persons generally, an intention to deceive and injure any one who may be thereby deceived and defrauded may be implied."

In 14 American and English Encyclopedia of Law (2d Ed.) 2122, the rule is stated as follows:

"The action [of deceit] will lie against any person who makes a false representation of fact, with knowledge of its falsity, and with the intent that it shall be acted upon, when the person to whom it is made acts upon it, and by so doing suffers injury. For the purpose of this remedy fraud or deceit may be defined generally as consisting in leading a person into damage by willfully or recklessly causing him to believe and act upon a falsehood."

It is further insisted by counsel for defendants that there is no privity between the plaintiff and the defendants in this action; that it was not the purpose or intent of the defendants to defraud the plaintiff at the time they procured the bills of lading to be made out in the manner aforesaid; that by mere indorsement of a bill of lading the shipper does not, as by signing or indorsing a negotiable instrument, undertake to pay out any money or furnish goods, but he merely transfers whatever title he may have in the goods; and that the transferee of the bill of lading cannot hold the shipper upon any contract to furnish the goods therein mentioned, inasmuch as it contained no contractual stipulation on the part of the shipper.

As we have stated, there is no question as to the fact that the defendants made false and fraudulent representations as to the commodity described in the bills of lading; and this naturally suggests the inquiry as to whether, under the circumstances, they ought not to have anticipated that the same were likely to fall into the hands of a third party.

While bills of lading may not be technically termed negotiable instruments, yet they are recognized as quasi negotiable instruments; and it is a well-known fact that in the commercial world they are used in transactions as collateral security upon which large sums of money are borrowed from various banking institutions. In the case of The Kirkhill, 99 Fed. 578, 39 C. C. A. 661, Judge Brawley, in referring to bills of lading, said:

"Bills of lading are documents which pass from hand to hand. They enter largely into the commercial business of the world, and the strict rights of the holders must be absolutely maintained, or they will lose a material part of their value as instruments of commerce."

Also in 2 Cook on Corps. (6th Ed.) § 413, note 1 contains the following:

"The phrase 'quasi negotiable' has been termed an unhappy one, and certainly it is far from satisfactory, as it conveys no accurate, well-defined meaning. But still it describes better than any other shorthand expression the nature of those instruments which, while not negotiable, in the sense of the law merchant, are so framed and so dealt with as frequently to convey as good a title to the transferee as if they were negotiable."

In the case of Pollard v. Reardon, 65 Fed. 848, 13 C. C. A. 171, the court, in discussing bills of lading, said:

"In the developments of commerce and commercial credits the bill of lading has come to represent the property, but with greater facility of negotiation, transfer, and delivery than the property itself. It is a negotiable instrument, even though not in the same sense as promissory notes or bills of exchange. It carries on its face in the words 'and assigns' an authority to dispose of it, and, as we have seen, a like authority, when indorsed in blank, by which the person who voluntarily puts it out, or permits it to be put out, ought to be estopped. And it has become so universal and necessary a factor in mercantile credits that *the law should make good what the bill of lading thus holds out.* There is every reason found in the law of equitable estoppel and in sound public policy for holding, and no injustice is involved in holding, that, if one of two must suffer, it should be he who voluntarily puts out of his hands an assignable bill of lading, rather than he who innocently advances value thereon."

The learned judge in charging the jury, among other things, made the following statement:

"It further appears from the testimony that the defendants, when they shipped the articles referred to in the bills of lading, knew that they were linters and not cotton, under the pretensive excuse that they desired them shipped as cotton, and not as linters, in order that, in case of destruction while in transit, they should be entitled to recover from the carrier their full value and not be limited to an arbitrary value of 2 cents per pound, as, in consideration of accepting that as the value, the railroads undertook to transport linters at a cheaper rate than cotton. * * * I find from the testimony, therefore, for the purposes of this ruling, that the defendants knew that the description of the articles as inserted in these bills of lading was cotton, when in fact the articles were linters; and they knowingly accepted, and took the bills of lading containing that misstatement."

The court also, in its charge, called attention to the fact that this excuse was pretensive, and that the defendants could, by the exercise of ordinary intelligence and through the ordinary avenues of information at their command, have ascertained that it was pretensive, and that the articles could have been shipped describing them as linters without detriment to the right of either the shipper or consignee or transferee to recover the value in case of loss from the carrier; the only difference being that in such case the rate of freight upon them would have been of a higher rate than if shipped as linters at the reduced valuation of two cents per pound.

When we consider the conduct of the defendants, we are forced to the conclusion that it was either their purpose to aid All & Son in an attempt to practice a fraud upon the railroad company, in the event the goods were destroyed in transit, or that they fully understood the pretensive excuse offered by All & Son in procuring the bills of lading containing the false and fraudulent statements. In either case they were fully aware of the fraudulent intent of All & Son; and by lending their aid in the manner described they thereby evinced a willingness to engage in what they knew to be a fraudulent transaction, and one which must necessarily have resulted in injury to the carrier or some one else. Therefore there is no viewpoint from which we may consider this matter without being forced to the conclusion that the defendants had full knowledge of the fact that, in procuring the bills of lading in question, it was the purpose of All & Son to defraud the railroad or some one else.

It is significant that the learned judge who heard the case and observed the conduct of the witnesses while upon the witness stand, and carefully considered all the testimony, was of the opinion that the defendants must have known that the excuse which they offered was pretensive.

Under the circumstances surrounding this case, the conclusion is irresistible that the defendants were aware of the fact that these bills of lading would be used by All & Son for the very purpose for which they were used, and that the use of the same by All & Son would necessarily result in injury to the party with whom they were to be hypothecated.

[1] It should be borne in mind that we are dealing with the law of fraud, and not with an action on a contract for breach of warranty or for simple negligence. If this were an action for breach of warranty or for simple negligence, the term "privity" would be applicable, and in order to enable the plaintiff to recover it would have to be shown that there was a breach of contract duty owing to the plaintiff, as was stated in the case of Savings Bank v. Ward, 100 U. S. 195, 25 L. Ed. 621, wherein the court, among other things, said:

"Every imputation of fraud is disclaimed, and it is clear that the transaction is not one immediately dangerous to the lives of others. Where there is fraud or collusion, the party will be held liable, even though there is no privity of contract; but where there is neither fraud or collusion nor privity of contract, the party will not be held liable, unless the act is one imminently dangerous to the lives of others, or is an act performed in pursuance of some legal duty."

[2] The rule announced in that case does not apply to the case at bar. In this case the question as to whether there was a contractual relation between the plaintiff and the defendants does not arise. The true test is as to whether the defendants, with full knowledge of the facts, procured the bills of lading in question knowing that the statements contained therein, to the effect that they were issued for cotton, were false and fraudulent, and with the further knowledge that the same were to pass through the channels of commerce, and would, in all probability, fall into the hands of a third party.

In this case the defendants, by their fraudulent conduct, gave All & Son the power to defraud the plaintiff or some one else; and it necessarily follows that they must answer to the party injured for their fraudulent conduct. It is also well settled that, where one of two innocent parties must suffer on account of the fraud of another, the loss must fall upon him whose conduct enables such third person to commit the fraud. This principle is clearly announced in the case of Bowers v. Lumber Company, 152 N. C. 604, 68 S. E. 19. There the court, in referring to this phase of the question, said:

"We further said that, as the certificates had been signed by the president and delivered to the cashier, the bank had given to the latter the power to commit the fraud, and must answer for its negligent act, upon the principle that, 'whenever one of two innocent persons must suffer by the act of a third, he who has enabled such third person to occasion the loss must sustain it.' Lickbarrow v. Mason, 2. T. R. 70. It was said by Lord Holt in Hearn v. Nichols, 1 Salk. 289: 'For, as somebody must be a loser by this deceit, it is more reasonable that he who employs and puts a trust and confidence in the deceiver should be the loser than a stranger.' In Railroad v. Kitchin, 91 N. C. 39, we held that, 'where one of two persons must suffer loss by the fraud or misconduct of a third person, he who first reposed a confidence, or by his negligent act made it possible for the loss to occur, must bear the loss.' The principle is well stated in the case of Railroad v. Bank, 60 Md. 36, as follows: 'It may be conceded, and was doubtless the case, that the agent had no authority in fact to issue such certificate. He had no real authority, as between himself and his principal, or other parties cognizant of the facts, for doing the particular acts complained of; but the company by its own act and, as it turned out, misplaced confidence placed the agent

in the position to do, and procure to be done, that class of acts to which the particular act in question belongs; and in such case, where the particular act in question is done in the name of and apparently in behalf of the principal, the latter must be answerable to innocent parties for the manner in which the agent has conducted himself in doing the business confided to him. Upon no other principle could the public venture to deal with an agent. In such case the apparent authority must stand as and for real authority.' And again: 'Where he issued such a certificate and delivered it to a third party, who acted without knowledge and in good faith, paying value for it, such party had the right to act upon the presumption that the representations of such certificates were truthful, and not false and fraudulent. Having confided to him the said trust of executing the business, the agent was held out to the public as competent. faithful, and worthy of confidence; and, though he deceived both his principal and the public by forging and issuing "false certificates," it is but reasonable that the principal, who placed him in the position to perpetrate the wrong, should bear the loss.' We think the principle is also well supported by the reasoning of the court in McNeil v. Bank, 46 N. Y. 325 [7 Am. Rep. 341]."

In view of the rule announced in the foregoing case (and there are many others, both state and federal, of similar import), we are impelled to the conclusion that the defendants, by their conduct, have placed themselves in a position where they cannot be heard to say that they did not intend the consequences of their acts.

However, it is insisted by counsel that the descriptions, representations, and recitals in the bills of lading are to be regarded as made by the carrier and not by the shipper, and create a contractual liability of the carrier only, and that, therefore, the railroad company is liable to the plaintiff, and that this suit should have been instituted against it rather than the defendants. That question is not before this court, inasmuch as the railroad company is not a party to this action. Even if it were a party to this suit, and it should be shown that it was liable, that would not exonerate the defendants from any liability that they may have incurred on account of their conduct as respects this transaction.

In view of the authorities upon which we rely and the principle which we think controls in this case, we are of the opinion that the court below erred in directing a verdict in favor of the defendants. For the reasons herein stated, the judgment of the lower court is reversed, and the case remanded for further proceedings in accordance with the views herein expressed.

Reversed.


KELLER, District Judge (dissenting). While I agree with the general proposition asserted in the opinion of the majority of the court, that the defendants in these two cases may be held liable for any actual loss occasioned to the plaintiff by reason of any misrepresentations made by them as to character of the merchandise consigned by them to J. H. C. All & Son, I desire to say that, in my judgment, such recovery must be limited and qualified by two important matters which, in my judgment, would prevent any recovery upon such a record as the one before the court.

First. The recovery must not and cannot be had upon the basis of the value of "fully low middling" cotton, which is what All &

202 F.—7

Son represented the bales to contain, but upon "cotton" as billed by defendants, which billing, in my judgment, amounts to no more than a representation that the contents of the bales were correctly designated as "cotton," and hence would be a fit term for any product customarily billed as "cotton"; and, if I understand the testimony of Mr. Bloodworth (a witness for the plaintiff) aright, "cotton," properly billed as such, may be worth as little as five cents a pound. See page 83 of record.

It is certainly not fair to say that because the plaintiffs billed these "linters" as "cotton" that they thereby represented them to be "fully low middling" cotton. Suppose All & Son had represented the contents of these bales to be of the very highest grade, and thereby more greatly deceived the plaintiffs. Could it be said that such fact would increase the liability of defendants? Surely not, and their responsibility must be limited by the designation they themselves gave to the shipment, to wit, "cotton."

Second. It must not be forgotten that J. H. C. All & Son were the original debtors, and that these shipments were put up, along with other collaterals, as security for the debt. It seems to me that, before there can be any recovery against the defendants, all the other securities put up by All & Son must be exhausted, or shown to have no value, as otherwise a grave injustice might be done to them, not capable of being repaired. It would seem from the record (pages 76, 77, etc.) that the plaintiff has in its possession certain policies of insurance and a mortgage that may have value, and, if so, the defendants are entitled to have credit for such value against the indebtedness of All & Son.