BROWNING et al. v. BOSWELL et al.

(Circuit Court of Appeals, Fourth Circuit.   June 9, 1914.)

No. 1217.

1. MINES AND MINERALS (§ 55*) — COAL MINING LEASE — CONSTRUCTION OF CONTRACT.

By an instrument denominated a lease, the lessor conveyed to the lessee a coal mining plant, with equipment, tools, stores, etc., with the right to mine and remove the coal from a specified vein on a tract of land described generally but not by acreage for a term of 50 years, for which the lessee was to pay the sum of $200,000 and a royalty on the coal produced, to be not less than a specified quantity annually, with a provision giving the lessor the right to forfeit and re-enter on default.   The lease expressly provided that it was in gross and not by acreage.   *Held*, that the contract was not one for the sale of coal in place but a mining lease; so much of the $200,000 as was in excess of the value of the plant being a bonus for the right to mine and sell the coal on payment of the royalty.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 153–165; Dec. Dig. § 55.*]

2. MINES AND MINERALS (§ 70*) — SPECIFIC PERFORMANCE (§ 64*) — MINING LEASES—REMEDY FOR BREACH.

In case of a mining lease, a court of equity has no power to decree a specific performance or an abatement of the price the lessee has contracted to pay for the right to mine and remove the mineral; the only remedy of either party for breach of the contract or for fraud being a cancellation of the lease, with perhaps a right of action for damages.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 192–197; Dec. Dig. § 70;* Specific Performance, Cent. Dig. §§ 191–195, 198; Dec. Dig. § 64.*]

3. ESTOPPEL (§ 68*)—GROUNDS—POSITION IN JUDICIAL PROCEEDINGS.

Where a corporation, which succeeded to the rights of the lessee in a coal mining lease, resisted a suit by the lessor for a forfeiture of the lease, obtained and acquiesced in a decree denying a forfeiture, referring the case to a master to compute the amount due the lessor under the terms of the lease, and making it a lien, and continued to mine and remove coal for two years with as full knowledge as the lessor as to the condition and extent of the coal underlying the property and until it became hopelessly insolvent through no fault of the lessor or failure of the mine, it is estopped to ask a cancellation of the lease or an abatement of the bonus agreed to be paid for the mining right on the alleged ground that the quantity of coal was misrepresented by the lessor.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 165–169; Dec. Dig. § 68.*]

4. MINES AND MINERALS (§ 58*)—COAL MINING LEASE—VALIDITY.

Evidence *held* insufficient to sustain the claim of a coal mining lessee that the lease was induced by fraud of the lessor.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 168, 169; Dec. Dig. § 58.*]

Woods, Circuit Judge, dissenting.

Appeals from the District Court of the United States for the Western District of Virginia, at Lynchburg; Henry Clay McDowell, Judge.

Suit in equity by Thomas T. Boswell, Merville H. Carter, and Andrew C. Snyder against the Big Vein Pocahontas Coal Company, in which Ollie H. Browning, and James S. Browning, Jr., an infant, by

James S. Browning, his next friend, were interveners. Suit by the Colonial Trust Company against the Big Vein Pocahontas Coal Company. Suits consolidated. From the decree, interveners appeal. Reversed.

See, also, 126 C. C. A. 512, 209 Fed. 788.

W. J. Henson, of Roanoke, Va., and Richard B. Tippett, of Baltimore, Md. (Henson & Bowen, of Tazewell, Va., on the brief), for appellants.

W. H. DeC. Wright, of Baltimore, Md., and Geo. W. St. Clair, of Tazewell, Va. (E. P. Keech, Jr., and Charles Morris Howard, both of Baltimore, Md., on the brief), for appellees.

Before KNAPP and WOODS, Circuit Judges, and DAYTON, District Judge.

DAYTON, District Judge. This record is voluminous. It comprises more than 1,500 printed pages. A number of questions are raised touching the jurisdiction of the court and the pleadings allowed to be made. We will not undertake to discuss many of these questions, not because we have not carefully considered them, but because, in our view of the true solution of the controversy, this discussion and determination become unnecessary.

The material facts, as briefly summarized as possible, may be stated to be these: Mrs. Browning is the owner of two tracts, and, as tenant in common with her infant son, James S. Browning, of a half interest in a third tract of land situate in Tazewell county, Va. She also claims an interest in a fourth tract, known as the Hoge land, but her rights therein are disputed by adjoining landowners. These tracts adjoin each other and are partially, at least, underlaid with the well-known Pocahontas Coal seams. Prior to March 12, 1909, she had erected the necessary plant and machinery to conduct a mining operation of the vein known as No. 3 of this coal. In connection with this plant and machinery, she was conducting a store or commissary. The court below estimated that such plant, machinery, live stock used in the mining operation, and commissary were reasonably worth $25,000. The mining operation was personally conducted by Mrs. Browning, and she was the legal guardian of her infant son.

On this March 12, 1909, she in her own right and as guardian of her son, and her husband, entered into a very full, elaborate, and carefully drawn agreement of lease with Thomas T. Boswell. It will be sufficient for our purposes to call attention to the fact that: (a) It gave the lessee the exclusive right to mine and remove, within a period of 50 years, all the "Pocahontas No. 3" vein of coal underlying two of the tracts and a portion of the third lying "north of the top or summit of Laurel Ridge"; (b) that it described by metes and bounds only one of the three tracts, and in no way attempted to estimate in acres the combined boundary of the three tracts; (3) that in express terms it provided that the lease was in gross and not by acreage; (d) that it sold outright and transferred to Boswell the mining plant, commissary, machinery, etc., used and operated theretofore by Mrs. Browning; (e) that the consideration to be paid was $50,000 cash on or before April

1, 1909, and $150,000 in three equal annual payments thereafter, with interest from date until paid at the rate of 5 per centum per annum (with lien reserved upon all the property leased and sold to secure payment) and a long ton royalty of 15 cents to be paid for the coal mined and removed; (f) that this royalty should, for the first three years, amount each year to the sum of $22,500, payable in quarterly installments of $5,625, beginning on April 1, 1909, and ending on March 31, 1912, and thereafter it should amount to at least $45,000 a year, payable in quarterly installments; (g) that any failure on the part of the lessee to keep and perform its terms and conditions for a period of 30 days should, at the option of the lessors, ipso facto operate as a forfeiture of the lease with right to lessors of re-entry and possession; (h) that the lessee should have until April 1, 1909, to examine title to the property and, in case he found defects therein, to disaffirm the contract and be reimbursed the money paid by him; and (k) that, upon expiration of the lease, the lessors should have right to purchase improvements made by lessee at a price fixed by agreed arbitrators, and, if not so purchased, then lessee should have right within 90 days thereafter to remove the same.

Boswell thereupon organized the defendant corporation, the Big Vein Pocahontas Coal Company, and assigned this lease to it, it assuming his obligations thereunder; the Brownings, however, not being parties to such assignment. This corporation was organized with an authorized capital of $300,000, which it is alleged was issued and fully paid up. On May 1, 1909, it executed a deed of trust to the Colonial Trust Company, trustee, upon the property, to secure a bond issue of $400,000, of which it issued, sold, or put up as collateral security $275,000 thereof. Carter, Snyder, and Boswell became stockholders and bondholders of the company, and Boswell also became a surety of it for over $11,000 on its notes. After an operation of nearly 19 months, this company found itself in financial difficulties. It had subjected itself to demand of forfeiture of the lease by the Brownings, for that it had paid to them upon the $50,000 installment, on April 1st preceding, only the sum of $25,800 (and $15,000 of this had been paid in stock of the company), leaving $24,200 overdue and unpaid. In addition to this it was in arrears to them in the further sum of $5,625 for due and unpaid royalties. In this condition of things, Carter, Snyder, and Boswell filed their bill in the court below, setting forth the facts in detail and charging that valuable improvements in the nature of a large and superior mining plant, costing $220,000, had been made upon the property, in consequence of which, and for other causes, the company was temporarily unable to meet its obligations to the Brownings, to its working miners and others, but expressing their belief that the property and assets of the defendant company far exceeded in value the amount of its indebtedness, provided its integrity should be maintained and its operation continued and the dissipation, loss, and waste, which would inevitably result from the levying of executions upon the same, prevented. It is to be particularly noted that in this bill not the slightest assault is made upon the integrity of the lease with the Brownings, but, on the contrary, its validity, its assignment by Boswell to the company, the assumption of its fulfillment by the latter, and the

amounts of payment under it, due and to become due and payable, to the Brownings, as well as the payments actually made, are clearly and correctly set forth. The sole defendant to this bill, the Big Vein Pocahontas Coal Company, by its treasurer, with full authority conferred upon him by its stockholders to do so, filed an immediate answer, and upon such bill and answer the court below at once appointed receivers to take charge of the company's property and continue its mining operations.

Some 10 to 15 days thereafter (exact date not given in the record), the Brownings presented their petition in this cause, admitting the execution of the lease to Boswell, his assignment thereof to the company, and calling attention specifically to certain of its clauses under and by virtue of which they charged a forfeiture thereof and asserted their right and election to re-enter and take possession, and prayed the receivers be ordered to turn over the property to them. However, if the court should determine to refuse them this relief, they averred their lessee Boswell to be a nonresident of the state, financially embarrassed, and his assignee, the company, to be practically insolvent, and their only security for the balance due them to be the coal in place; in consequence they insisted that a first lien for the unpaid balance of the $200,000, and for the royalty money set forth in the lease, be decreed direct against the property, and that the receivers be not permitted to mine such coal so long as arrears of such debt and royalty remained unpaid. They alleged in this connection:

"If the receivers are unsuccessful and do a losing business, as the company seems to have done, petitioners' coal will be mined, leaving unpaid the deferred payments. In other words, the petitioners run the entire risk of a successful operation of the plant by the court's receivers, and the corpus of their property is being used for these purposes."

To this petition Boswell filed a detailed answer manifestly for the sole purpose of contesting the demand of the Brownings for a declaration of forfeiture of the lease and an order directing the receivers to turn over the property to them. To this end he denied either himself to be financially embarrassed or the company to be practically insolvent. On the contrary, he says:

"He believes that, if the orderly administration of the trust may be allowed to proceed without interference from the petitioners, then said petitioners will receive all payments properly and lawfully due unto them, and that their rights under said lease, as the same may be adjudicated by this honorable court, will be secured and protected."

Again it is to be distinctly noted that in this answer no assault is made upon the right of the Brownings to recover the full $200,000, less payments made, and the royalty provided for in the lease; in fact, their right to have the same declared a first lien as claimed by them, in case forfeiture of the lease be denied, is not contested. The sole contention is that "petitioners should not be permitted to interfere with the orderly administration of the trust" by the receivers under direction of the court.

The Big Vein Pocahontas Coal Company, Snyder, and Carter, and the Colonial Trust Company, trustee, appeared and filed answers to

this petition of the Brownings, all adopting and affirming each and every allegation set forth in Boswell's answer thereto. To these answers replications were filed by the Brownings. About this time, the last of January or first days in February, 1911 (the exact date is not set forth in the record), the court heard the cause upon this petition of the Brownings, and among other things—

"ordered, adjudged, and decreed that Ollie H. Browning, in her own right, and as guardian of James S. Browning, Jr., infant, shall have and be entitled to a first and prior lien upon the, lands, real estate, property, equipment, and improvements constituting the corpus of the lease from said petitioners unto Thomas T. Boswell and in the proceedings referred to, for all the royalties due and to become due, according to the terms of said lease and for the true and lawful balance remaining unpaid upon the bonus payment of $200,000 in said lease mentioned and covenanted to be paid, and all interest due and to become due thereon; the amount of such principal and interest, respectively, to be ascertained and reported by the master appointed in these proceedings."

Such master by the decree was appointed and subsequently reported to be due upon the $200,000 claim a balance of principal and interest of $139,746.59, on July 24, 1911. Again it is to be noted that, at the time the master considered this matter, Boswell, the company, Snyder, and Carter, and the Colonial Trust Company, trustee, had made themselves parties to the proceedings by intervening and filing their answers to the petitions of the Brownings, asserting their claims and demands under the lease; that the master took the evidence necessary, ascertained the balance due, and made his report, with not a single objection made by these parties or any one of them to the claims or to his report finding this balance due thereon.

More than six months after the entry of this decree ascertaining the right of the Brownings to recover the unpaid balance of the $200,000, and declaring it a first lien upon the property (which decree never was appealed from), and nearly a year after the appointment of the receivers, and more than two years after the execution of the lease and continuous acceptance and operation thereunder, with a master's report unexcepted to by these parties filed in the cause ascertaining the unpaid balance due, Snyder and Carter, two of the original plaintiffs, and the Big Vein Pocahontas Company, the original defendant, filed a supplemental answer and cross-bill to the Brownings' petition, and subsequently Boswell did likewise. These answers and cross-bills alleged that Boswell had been induced to enter into the lease by reason of false representation made by the Brownings as to how much of the leased premises was underlaid with the No. 3 Pocahontas vein of coal, and prayed a rescission of the lease and return payment of the sums paid by Boswell or the company, including sums expended in the erection of the new plant, or, in default thereof, for an abatement of both the $200,000 and the royalty to be paid for the lease.

Defense was made to these cross-bills by demurrer and answer; the demurrer was overruled, a replication filed, and depositions taken. While the taking of the depositions was in progress, an amended cross-bill was filed, which Mrs. Browning answered, and issue was joined thereon, and further depositions were taken, and the cause heard on its merits.

The court rendered a written opinion, holding that a case for abatement of the purchase price had been made out, and that the cross-complaint had also made a case for damages by reason of the corporation having constructed an unnecessarily expensive plant, the coal acreage considered, and announced its intention to refer certain questions to a master to ascertain and report thereon. Thereupon Mrs. Browning filed two petitions, accompanied by affidavits of herself and others, asking that certain matters arising on the record be also referred to the master, to whom the cause was to be referred.

The prayer of the first petition was that the master might inquire and report the value of the Browning plant already erected and in operation at the time of the lease, including the stock of goods, mules, and timber rights that went with the lease. The other petition averred that the Big Vein Pocahontas Coal Company knew the fact that a great portion of the leased premises was not underlaid with coal prior to the erection of its plant, or a greater part thereof. Evidence to that effect having been already taken, and full affidavits filed with the petition insisting that if the corporation was entitled to any damages at all, by reason of the erection of an unnecessarily large plant, the corporation was not entitled to damages on account thereof, for any portion of the plant erected after knowledge of the facts, the court was asked to have the master take evidence and report as to matters set up in said petition. But the court overruled both petitions and declined to refer any of the matters referred to therein to the master.

The infant, James S. Browning, Jr., who had not been made a party to the proceedings, but who was a party to the lease, by his guardian, then filed an intervening petition setting forth his interests in the premises, calling attention of the court to the proceedings in Tazewell circuit court for the confirmation of the lease, and to the fact that said cause was still pending, and that all the parties were before that court; that the lease as to him was a judicial lease; that the circuit court of Tazewell county was the only court that had the jurisdiction to rescind the lease, or modify its decree of confirmation, by abatement of the purchase price, and further insisting that, if he was wrong as to this, he was certainly entitled to be made a party defendant to these proceedings so that his interests might be protected, and urged the court to require the cross-complainants to amend their bill, by making him a party defendant, in order that he might appear and protect his rights in the premises; and that the court would then appoint him a guardian ad litem to represent his interests in the cause. The prayer of this petition was overruled by the court. The court then referred the cause to a special master, to take evidence and report on the following matters:

"(a) The difference between the value to the present plant at the time the coal in No. 3 seam will be exhausted if worked out under the present lease and the value at that time of such a plant as a reasonable, prudent coal operator, having ample capital, should have installed for the best results; it having been fully known at the date of the lease that the lease included 431.4 acres of land entirely barren.

"(b) Also the difference between the value to the successors in interest of the lessee under the lease of March 12, 1909, filed with the original bill in this cause, of the plant that has been installed on the leased premises by the

Big Vein Pocahontas Coal Company and the value to it and its successors in interest of such plant as is' described in paragraph (a) above. In ascertaining this item, account will be taken from the installation of the plant now on the premises to the date at which the available coal of the No. 3 bed on the premises will probably be exhausted if mined as provided for under the aforesaid lease; and also account will be taken of the provision in the lease in regard to the rights of the parties as to the plant upon the exhaustion of the No. 3 bed of coal.

"(c) If desired by counsel for either side, the said master will also take evidence concerning the report whether or not the Big Vein Pocahontas Coal Company installed an unreasonably expensive plant in view of a justifiable belief on its part that the leased premises carried approximately 647.8 acres of the No. 3 bed of coal; and if so, how much more the said plant cost than should reasonably have been expended thereon, under the belief above mentioned.

"(d) The area of the No. 3 bed of coal mined out prior to April 1, 1909.

"(e) The area of the said bed of coal rendered commercially unavailable prior to April 1, 1909.

"(f) Whether or not the Big Vein Pocahontas Coal Company or the receivers in this cause have committed waste of coal or have damaged the mines by improper mining; and if so, to what extent pecuniarily?"

"The difference between the cost of the plant which has been installed by the Big Vein Pocahontas Coal Company on the premises leased by the contract of March 12, 1912, filed with the original bill in this case, and the cost of such plant as a reasonably prudent coal operator, having ample capital, would have installed for the best results, had it been fully known at the date of the lease that the leased premises included 431.4 acres of land entirely barren of coal."

Much evidence was taken before the master, who made and filed his report, to which report Mrs. Browning filed sundry exceptions.

In the meantime, Mrs. Browning filed a petition for rehearing, contending that the principles upon which the court proposed to make the abatement, as expressed in its opinion, were entirely wrong, and suggested what, in the opinion of her counsel, was the proper principle upon which the abatement should be made, if any abatement was made at all.

The cause came on to be heard; the court declined to recede from the principles as to the abatement it had already adopted, overruled all the exceptions of Mrs. Browning to the report of the special master, and, after making the necessary calculations, abated the purchase money by $121,113.79, and rendered a decree against Mrs. Browning for the additional sum of $51,353.47, for damages. Said damages being the difference between the cost of the plant actually constructed and such a plant as in the opinion of the master and court a prudent man would have constructed, had the shortage in the coal area been known at the time.

Prior to the rendition of this last-named decree, the Big Vein Pocahontas Coal Company having made default in the payment of the interest on its bonds, the trustee, the Colonial Trust Company, filed, in the Circuit Court of the United States for the Western District of Virginia, its bill against the Big Vein Pocahontas Coal Company, praying a foreclosure of the mortgage, and that cause and the one under consideration were consolidated and heard together, and the court thereupon, at the same time it rendered its decree against Mrs. Browning, rendered a decree in this consolidated cause foreclosing the mortgage

and decreeing a sale of the premises. Mrs. Browning then filed a petition for rehearing, which was dismissed.

From the decrees abating the purchase money and decreeing the damages, Mrs. Browning has appealed to this court. From the decree denying the prayer of her petition for rehearing and dismissing the same, and from the decree rendered April 10, 1913, James S. Browning, Jr., an infant, suing by his next friend, James S. Browning, has also appealed.

A discussion of a number of questions arising as regards the regularity of these pleadings and the correctness of the rulings of the court below, set forth in the assignments of error and very ably argued by counsel upon both sides, might be interesting, but in our opinion is unnecessary. Both sides to the controversy have practically shifted their positions. The Brownings, in the beginning, insisted that the lease be declared forfeited, but after the court, by its decree entered about the 1st of February, 1910 (exact date not disclosed by the record), had adjudged the integrity of their demand for the purchase price of $200,000 and the 15 cents long ton royalty and declared them to be entitled to a first lien upon the property as security therefor, their future efforts seem to have been directed in effect toward maintaining the integrity of this decree. On the other hand, as we have seen, their opponents, comprising their lessee Boswell, Snyder, and Carter, his codefendant in the original bill, the corporation, sole defendant therein, and the trust company, its mortgage trustee, coming in by intervention, did not deny at first the Brownings' right to their full purchase money and royalty and the lien fixed therefor, but resisted the declaration of forfeiture. Subsequently, however, they joined in denying the debt of the Brownings, set up fraud in the procurement of the contract, and, because thereof, demanded either, first, rescission, or, second, abatement, of such contract debt. Had the Brownings stood squarely upon their demand for a declaration of forfeiture and their right to re-enter and have possession of the property, it is not at all certain that they would not have been entitled to it, but not having appealed from the decree denying them this right, but, on the contrary, having in effect acquiesced in the terms of this decree adjudging to them their $200,000 and 15 cents royalty, they must be held to have waived their right to forfeiture. And, having waived the forfeiture, it does not seem to us that they can deny now the jurisdiction of the court because of the interest of the infant son being under the state court's control. Mrs. Browning was undeniably the guardian of this infant, and the lease executed by her as such guardian, as well as in her own right, was approved by this state court in the infant's interest. But, if this were not so, the forfeiture waived and the institution of the second suit by the Colonial Trust Company, trustee, to foreclose and sell the property for default in payment of interest, undoubtedly conferred jurisdiction because of an independent relief sought thereby, wholly beyond the state court's power to grant under the bill and proceedings pending before it. Therefore the consolidation of these two causes by the court below enables us to sweep all technical questions aside and determine this controversy upon its merits; upon the ques-

tion of whether or not the court below was justified in abating the purchase price of the lease and awarding damages for a new plant erected at unnecessary cost, considering the amount of coal to be mined actually under the premises.

[1] I. What is this contract? It is one conferring on Boswell the right to enter upon the Brownings' land and remove all the coal underlying it of this particular seam upon certain conditions and for a fixed price to be paid for each ton to be removed. What is or was this $200,-000 to be paid for? Certainly not as a price for the coal, or else the contract would have required the royalty payments of 15 cents per ton when removed and payable to be credited upon it. On the contrary, $25,000 of it was for plant and personal property sold outright at value and delivered, and the remaining $175,000 was a bonus agreed to be paid for the right to mine and remove whatever coal might underlie the land at a cost of 15 cents per ton upon the conditions and terms of payment set forth in the lease contract. In other words, this was a mining lease and not a sale of either land or coal by the acre, nor of a fixed quantity or number of tons, but, on the contrary, a right in gross, as specifically set forth in the contract to remove all the No. 3 seam of coal, much or little, underlying the land.

In mining sections of this country many such contracts, providing for the payment of bonuses for the right to bore for oil and gas and, to a lesser extent, to mine coal, have been made and are being made daily and have been universally upheld by the courts, although it has and may turn out that such mining leases are absolutely worthless by reason of no oil, gas, or coal underlying the land. Bonuses of this character are paid upon thousands of acres of land in such sections to hold the right to bore for oil and gas for fixed periods of from 30 days to 10 years, and the courts have enforced their payment. This is done upon the clean-cut distinction to be drawn between a contract which sells and conveys the property itself and one which grants the right to purchase it at a fixed price; in other words, between a sale contract and a lease contract. Such mining lease does not convey in fee the minerals in place, but only a contingent, defeasible interest therein. As said in Moore v. Sawyer (C. C.) 167 Fed. 826:

"An instrument in terms granting all the oil, gas, coal, and asphaltum under certain described land, but which was denominated a lease, had a definite term of 15 years, and provided, in addition to a cash payment of $50, for the payment of a royalty on all oil produced, held not a conveyance in fee of the minerals in place, but merely a lease."

In Backer v. Penn. Lubricating Co., 162 Fed. 627, 89 C. C. A. 419 (6th Ct. Ct. App.), it is said:

An oil lease in ordinary form, giving the lessee the exclusive right to explore for, produce, and sell oil from the land on payment of a royalty, does not vest him with title to the oil in place.

In Kansas Nat. Gas Co. v. Board, Com'rs, etc., 75 Kan. 335, 89 Pac. 750, held:

An oil and gas lease, conferring on the lessee the right to enter on, operate for, and produce oil and gas upon land described, and containing no provision indicating otherwise, grants a license to enter and explore, and, if oil

or gas is found, the right to produce and sever it. Until mineral of the kind is actually produced and severed so that it becomes personalty, the lessee has no title to any specified portion of it, but the legal title and the possession of the entire mass and volume remains in the owner of the strata in which it is confined.

See, also, Wagner v. Mallory, 169 N. Y. 501, 62 N. E. 584; Huggins v. Daley, 99 Fed. 606, 40 C. C. A. 12, 48 L. R. A. 320 (this 4th Ct.); Venture Oil Co. v. Fretts, 152 Pa. 451, 35 Atl. 732; Brown v. Fowler, 65 Ohio, 507–521, 63 N. E. 76; Steelsmith v. Gartlan, 45 W. Va. 27, 29 S. E. 978, 44 L. R. A. 107.

But it may be said that a coal lease is different from one for oil and gas. Only in degree and not in principle. The courts have held them to be analogous, as see Starn v. Huffman, 62 W. Va. 422, at page 426, 59 S. E. 179, at page 180, where it is said:

"It is true * * * that more diligence is required in oil and gas leases than leases for other minerals; yet the same general principles prevail."

See, also, Rorer Iron Co. v. Trout, 83 Va. 397, 2 S. E. 713, 5 Am. St. Rep. 285; Cowan v. Bradford Iron Co., 83 Va. 547, 3 S. E. 120, where the distinction between mining leases of this character and sales of mineral outright are very clearly drawn by the Supreme Court of the state from which this Browning Case comes to us. See, also, Archer on Oil and Gas, where many cases are cited and considered.

From these cases, it would seem clearly established that such mining leases at the instance of the lessor can be canceled as cloud on title by the courts for failure on the part of the lessee to promptly operate, although containing no forfeiture or re-entry clause as here, although containing no limit of time to run and no clauses fixing time to commence and defining the extent of operation as here.

[2] It follows, we think, inevitably, that, on the part of the lessee, courts can cancel in toto a lease that has been procured from him by fraud, but must deny his right to undertake to abate the payments to be made for the right to mine, agreed upon. The right to mine in such case is a right to produce and purchase and is not susceptible of division and abatement. The reason for this seems to us very apparent.

The lessee has the right to remove all the coal, but he is not required to remove it all. He is required to mine a minimum quantity each year and pay for it by the ton as taken, but, if he finds it unprofitable, he can forfeit the lease at any time, and the lessor's remedy is re-entry, and an action at law for damages possibly. If the court abates this "bonus" given for this right to mine and purchase, then there is nothing whatever to prevent the corporation lessee from mining the coal until it has reimbursed itself the balance of the unabated "bonus" and then quit. Or it, as in this case, may become insolvent and go into hands of receivers and eventual sale be directed as in this case. What can the court direct to be sold—the coal itself? Not by any means. It can sell only the right to mine and remove the coal upon terms and payments required by this mining lease. Such sale, in other words, can only, so far as the coal itself is concerned, create for the use of somebody a bonus sum to be paid for the right to mine and purchase. If

Boswell's bonus, agreed by him to be paid for this right, is abated as proposed, and it becomes necessary for Mrs. Browning to buy the right for her protection, it will in fact require her to pay a sum of money for the right to mine and sell her own property, and this in the interest of a bankrupt lessee who has wholly failed to comply with his contract to exercise that right to mine and purchase. Our conclusion, therefore, is that the right of abatement in cases of sales of mineral is clear as in all cases of real estate, where specific performance, rescission, or abatement can be decreed, but in the case of mining leases there can be no power in the courts to decree specific performance—no power to compel the lessee to mine and remove the coal—nor can a court, without making an entire new contract for the parties, divide up and abate in part an indivisible right to buy and remove the coal; the only remedy possible to either party who may have been defrauded is to have the contract canceled.

[3] II. This brings us to the question of whether this lease contract can or could be now canceled at the instance of these defendants. We think not.

First, because of their laches under the very many decisions, all uniform in tenor, illustrated by such as Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798, where it is said:

"Where a party desires to rescind, upon the ground of mistake or fraud, he must, upon the discovery of the facts, at once announce his purpose, and adhere to it. If he be silent, and continue to treat the property as his own, he will be held to have waived the objection, and will be as conclusively bound by the contract as if the mistake or fraud had not occurred."

And see Shappirio v. Goldberg, 192 U. S. 232, 24 Sup. Ct. 259, 48 L. Ed. 419, where this ruling is reiterated.

In this case it is unquestionably true that defendants held this property for nearly two years after they had information, in every respect as full and complete as Mrs. Browning or any other living soul at the time could have, as to the existence of this fault, yet they refused her offer to rescind, held on to the property, mined thousands of tons of the coal, had 20 years of mining assured before them (see Judge McDowell's opinion for this statement), resisted Mrs. Browning's right to forfeit the lease, filed this bill for the purpose, insisted that the lease be enforced, acknowledged her right to the bonus, allowed a decree to go therefor and for the royalty in arrears, a reference to be made to ascertain and a report to be made ascertaining the amount without objection. Only after it was seen that bad management, the overloading of the company by bond and stock issues, and other reasons, for which they were solely responsible, it had become impossible for them to comply with their contract did they originate this idea of saving for themselves whatever they could by securing the court to make a new contract for the right to mine the coal (not for the coal itself) and to sell this right under its new contract (which Mrs. Browning never agreed to) for such sum as can be realized therefor.

Second. The decree of January, 1911, was a final one, conceded to and unappealed from by these defendants, and estopped them from subsequent inconsistent claims for relief.

[4] III. We do not deem it necessary to dwell upon the question of misrepresentations charged to have been made by Mrs. Browning, as, under the view we have taken above, any such misrepresentations become immaterial, so far as abatement can be based upon them. It is sufficient for us to say that, in selling this right to mine and her plant to Boswell for $200,000, we do not from the evidence doubt for a moment that she regarded it as fully worth that. She had consistently valued the plant and coal in fee at $1,000,000; she made no representation as to the quantity of coal underlying the land; her lease in terms stated it was not to be of a specific number of tons but in gross, much or little; she could no more tell than could Boswell or any other man as to whether a fault existed under these lands because no bore holes had been made to test it and were only afterwards made by order of the court by the receivers, paid for out of funds arising from the sale of her coal. Boswell knew this. He admitted he was mistaken as to the hill she pointed to from her porch; he had, even after signing the lease, by its terms some 20 days for examination of title and property and, if he ascertained defects, to have the contract rescinded. We cannot restrain the strongest conviction that to allow Boswell and his associates, experienced coal operators, to maintain this defense at the time and under the circumstances they have undertaken to do so would be grossly inequitable.

It is practical experience in coal mining that it takes thousands of dollars and many months of time to open up a mine where operations can be carried on profitably—the internal development has, as shown by mine maps, to be done according to a fixed plan. In short, it is like laying off a town above ground but far more difficult. Streets (called headings) have to be first mined out ordinarily by pick, and it is a slow process; counter or cross headings have to be also picked out; rooms or squares have to be thus secured, the mining out of which can be done by cutting machines; air shafts and chambers have to be dug at large expense; the work goes on slowly and costly delays are inevitable. Add to this that a mine by reason of inexperienced, reckless, unscrupulous, or unscientific operation in laying out of these headings, air shafts, and chambers, the mining out improperly of coal where pillars should be left and maintained, and otherwise, may be almost, if not quite, ruined, and it will be apparent that, when Mrs. Browning gave over the control of a mine fully developed internally, and which had been successfully operated by her for years, taking all the risks of her lessee's possible bad operation thereof, the bonus she required to be paid was not at all unreasonable.

From these and other facts disclosed by the record we are fully persuaded that the parties dealt with each other at arm's length in making this a mining lease contract; that it was one of known hazard on the part of Boswell and his associates; and that their defense of fraud and misrepresentation, if not simply an afterthought arising when they realized the receivers' management was not likely to prevent default and loss to them in their investments, has at least proven itself wholly inadequate, under well-settled legal principles, to affect a contract of this character. It follows that the decree of the court be-

low must be reversed, and these causes be remanded, with instructions to enforce in full as a first lien the demand of the Brownings regardless of the defense so asserted.

Reversed.

WOODS, Circuit Judge (dissenting). The importance of the issues involved in this appeal seem to justify a statement of my reasons for dissent.

On March 12, 1909, Mrs. Ollie H. Browning, James S. Browning, her husband, and James S. Browning, Jr., an infant son, by Mrs. Ollie H. Browning, his guardian, made a contract with Thomas T. Boswell by which they agreed to sell to Boswell coal known as the "Pocahontas" or "No. 3" seam in lands particularly described in the contract, together with machinery, live stock, and other personal property, and to lease the lands for the purpose of mining the coal for the term of 50 years. Boswell agreed to pay as a consideration $200,000, $50,000 cash, and the remainder in three installments of $50,000 each, on April 1, 1910, 1911, and 1912, and also to pay a royalty of 15 cents for every long ton of coal mined. The lease contained, among many other provisions, this stipulation:

"It is expressly understood and agreed between parties hereto that this is a lease in gross and not by the acreage."

Boswell took possession of the property on April 1, 1909, but immediately thereafter, on April 14, 1909, in pursuance of his expressed purpose when the contract was executed, he assigned all of his rights to Big Vein Pocahontas Coal Company, a corporation organized for the purpose of mining the coal. By proceedings instituted in the circuit court for Tazewell county, Va., to which Boswell and the coal company were parties, the court's sanction of the contract in behalf of the infant was obtained, and Mrs. Browning was authorized to receive his share of the payments to be made. On May 1, 1909, the coal company executed to the Colonial Trust Company a mortgage to secure bonds to the amount of $400,000, of which $275,000 have been issued. Soon after taking possession the coal company began to make extensive improvements in the mining plant, and in a little more than a year spent in this work more than $200,000. The company was not successful, and on October 28, 1910, the United States Circuit Court for the Western District of Virginia appointed E. P. Keech, Jr., and H. H. Heiner receivers under a bill filed by creditors, asking for the appointment of receivers and a sale of the property for the satisfaction of the liens. Mrs. Browning was not made a party defendant to the proceeding, but on her own behalf, and as guardian of the minor, James S. Browning, Jr., intervened and filed her petition in the cause, setting up her rights under the contract, including her right to a lien for the unpaid portion of the $200,000 purchase money and for the royalties due and to become due. In the answers of Boswell and other creditors, and of the coal company itself, made to this petition, nothing was alleged against the right of the petitioner to the enforcement of the terms of the lease. An order was made providing, among other things, that

Mrs. Browning was entitled to a lien for the unpaid portion of the purchase money, and the royalty, and referring the matter to Mr. H. Claude Pobst, as special master, to ascertain and report all the indebtedness of the company with the priorities and securities of creditors. Thereafter the master made a report finding a balance due on the $200,000 purchase money of $139,746.59 as of July 24, 1911. Mrs. Browning filed an exception on a matter of interest; and, while the report remained unconfirmed, the coal company, jointly with two of its creditors, and Thomas T. Boswell and Colonial Trust Company each filed a pleading, called a cross-bill, and supplemental answer to the petition of Mrs. Browning, alleging that the lease contract had been obtained by false and fraudulent representations made to Boswell by Mrs. Browning and her husband, James S. Browning, as to the area of the leased land underlaid by No. 3 coal. On this allegation the court was asked to annul the contract or grant a fair abatement in the price contracted for, and to require Mrs. Browning and her husband to pay the coal company the money expended for a new plant and equipment in excess of the amount which would have been expended for a smaller plant, had the true area of the coal seam been known. Amendments were allowed, alleging fraud in the additional particulars that Mrs. Browning falsely represented to Boswell that she had been offered $1,000,000 for the property, and that without the knowledge of Boswell she employed and paid John M. Ambrose to aid in making the sale and lease as her agent, when she knew that he had been employed and was relied on by Boswell to aid him in the transaction.

After the consideration of volumes of testimony, the final judgment of the court was that the contract was procured by fraud; that the coal company was entitled to an abatement of $121,113.79 from the sum which Boswell had agreed to pay; and that there should be a further deduction of $51,353.47 for the excess expended on the plant and equipment which would not have been expended but for the deception of Mrs. Browning as to the extent of the coal area. The assignments of error on collateral matters may be more shortly disposed of after discussion of the main issue of misrepresentation.

1. It is perfectly clear that there has been no adjudication of this or any other matter involved in the litigation in favor of Mrs. Browning, for the report of the master as to the amount due her has never been confirmed. But, even if it had been, it was within the discretion of the district judge to open it.

2. Boswell was in search of coal lands and engaged Ambrose to aid him in finding coal suitable for his purpose. Through Ambrose, Boswell went to the land of Mrs. Browning in Virginia, and after inspection in company with Ambrose, and considerable conversation with Mrs. Browning and her husband and Ambrose, agreed with Mrs. Browning on the terms of the contract which was soon after executed in Baltimore. No complaint is made that the area covered by the lease was supposed by Mrs. Browning to be 1,057 acres and turned out to be only 762.1 acres. The misrepresentation alleged and relied on is that she and her husband plainly stated as a fact, which they had ascertained by proper tests, that the entire land, except that already min-

ed, was underlaid by Pocahontas coal, No. 3, whereas it turned out that there was a fault line in the land, and that all of the 431.4 acres south of that line was entirely barren of the coal seam.

Adjustment of the equities of the parties may be difficult, but it is evident that, if the contract between Mrs. Browning and Boswell is enforced according to its terms, Mrs. Browning will receive a large amount of money from the coal company, as assignee, for property which she did not have, and which therefore neither Boswell nor the coal company ever received from her.

Careful study of the record does not lead to the conclusion that Mrs. Browning was guilty of intentional falsehood in her representation as to the coal area. It is true that in mining she had followed the seam at one place almost to the surface; that at places it was almost perpendicular; that she had heard from others of a fault line beyond which the seam did not extend; and that she had been told by Mr. Mann, whom she should have regarded high authority, that she was mistaken as to the extent of her coal field. But it is also true that she had found coal south of Laurel creek, which she and others thought to be the supposed fault line; that, with or without reason, she had been embittered by contests about her coal land and supposed the hands of others were against her. The evidence of her attitude after the lease, as well as before, shows that these things had so warped her mind and perverted her judgment that she held to her conviction as to the coal area in the face of facts which would have overturned or at least shaken the conviction of an unprejudiced mind.

As to the precise language used by Mrs. Browning in expressing her conviction to Boswell and her reasons for it, the evidence is not reconcilable. But the exact places in which she said she had made entries showing that the coal underlaid all the land, and other details, are not of primary importance. The material fact proved is that she did tell Boswell that by making entries and by other means she had definitely ascertained that the coal seam underlaid all the land. Boswell was no doubt too trustful and should not have made so important a transaction without more careful investigation; but examination as to the extent of the coal field involved delay, and it does not lie in Mrs. Browning's mouth to say he and his associates must suffer and she herself profit by his reliance on her statement that she had ascertained as a fact that the coal extended under the entire land. Having induced the purchaser to confide in her positive declaration as to the extent of the coal area, she should suffer the consequences of her error by abating the purchase price, however honest may have been her convictions. McFerran v. Taylor, 7 U. S. (3 Cranch) 270, 2 L. Ed. 436; Smith v. Richards, 38 U. S. (13 Pet.) 26, 10 L. Ed. 42; Kell v. Trenchard, 142 Fed. 16, 73 C. C. A. 202.

"A court of equity would be of little value if it could suppress only positive frauds, and leave mutual mistakes, innocently made, to work intolerable mischief, contrary to the intention of the parties. It would be to allow an act originating in innocence to operate ultimately as fraud, by enabling the party who receives the benefit of the mistake to resist the claims of justice under the shelter of a rule framed to protect it." Story, Eq. Jur. (10th Ed.) § 155.

It is not possible that equity allows an exemption from this rule of those who sell coal lands on an explicit representation as to the area of coal.

The testimony is not convincing that Mrs. Browning intended to act corruptly with Ambrose as her own agent to sell while he was professing to aid Boswell as his agent in arriving at the value of the coal field. But the law looks with the utmost jealousy on double-dealing, and will always grant relief to a party making a transaction through an agent who, without his consent, has acted in association with the other party; and it is not necessary that there should be any intention to deceive or overreach. United States v. Carter, 217 U. S. 286, 30 Sup. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594; Ferguson v. Gooch, 94 Va. 1, 26 S. E. 397, 40 L. R. A. 234; Empire State Ins. Co. v. American Central Ins. Co., 138 N. Y. 446, 34 N. E. 200; Emons v. Alvord, 177 Mass. 466, 59 N. E. 126. Mrs. Browning's letter to Ambrose in response to his demand for a commission shows that she had given him to understand that she would pay him a commission upon an advantageous disposition of the coal, and, when the contract was made, she knew Boswell relied on him as his own agent. It made no difference that she may have forgotten her offer to Ambrose or attached no importance to it; she cannot claim the benefit of a bargain made under such conditions, especially when Ambrose by his own admission was acting the double part.

The statement made by Mrs. Browning to Boswell that the Consolidated Coal Company had made an offer of a million dollars for the property was based on another unwarranted inference of an inflamed and prejudiced mind. The evidence of Mrs. Browning that an offer of that sort was made seems to be uncontradicted. From the mere fact of an offer, she rushed to the unwarranted conclusion that it was made on behalf of her supposed enemy, the Consolidated Coal Company.

Importance is not attached to the action and statements of Col. Browning, for the reason that it would not be fair to hold Mrs. Browning bound by the sayings and doings of an inebriate husband, except in so far as they were sanctioned or confirmed by her.

For the reasons stated, it seems clear to me equity requires that Mrs. Browning should submit to an abatement from the consideration of $200,000 stipulated for in the contract, unless the claim be defeated by the particular defenses hereafter considered.

3. The demand that she should pay for the cost of the plant and equipment beyond what was required for the working of the coal actually acquired by Boswell stands on a different footing. This claim was allowed by the District Court under the principle laid down in Sigafus v. Porter, 179 U. S. 116, 21 Sup. Ct. 34, 45 L. Ed. 113, and other authorities, that one induced by false and fraudulent representations to make a purchase may recover, not only the difference between the real value and the price paid, but also such outlays as were legitimately attributable to the seller's conduct. On this point I am not only unable to concur in the finding by the District Court of actual fraud, but think the expenditures incurred in the erection of a plant and the

purchase of equipment beyond the real needs of the company were due to the negligence of Boswell and the coal company. According to the preponderance of evidence, facts were brought to the attention of Boswell, Sheehan, Ambrose, and other officers of the coal company only a few weeks after the lease contract was made, indicating the existence and location of the fatal fault line, and putting them on inquiry, if not on actual notice, that Mrs. Browning was mistaken as to the area of the coal land. Boswell, as the manager of the company, shut his eyes and went blindly forward with the expenditures, refusing to heed the warnings which required that he make careful examination before building the plant and supplying the equipment. The only explanation which suggests itself is that he was unwilling to face the truth after he had induced others to invest their money in the enterprise.

Whatever may have been the fault of Mrs. Browning, it was the duty of Boswell and the coal company to use due diligence to minimize the loss consequent upon her action; and the coal company cannot go to the extent of holding her responsible for the gross negligence of one or more of its officers in not heeding warnings as to the deficiency in coal area and in not making an examination before incurring any considerable expense. Warren v. Stoddart, 105 U. S. 224, 26 L. Ed. 1117; Cunningham Iron Co. v. Warren Mfg. Co. (C. C.) 80 Fed. 878; Lillard v. Kentucky, etc., Co., 134 Fed. 168, 67 C. C. A. 74. Assuming that no warning came until after the contract for the plant had been made, the company failed in its duty to endeavor to cancel or modify the contract, and thus reduce the damages falling on Mrs. Browning. For these reasons equity denies the right of the coal company to recover from Mrs. Browning the expenditures on the plant and equipment in excess of that required for the smaller area of coal.

The claim that this neglect of the lessees to have an examination of the coal field and their failure to make complaint of the shortage in coal area for about two years should also defeat the claim for an abatement of the purchase money is not well founded. It is true that such claims should be made as soon as the facts are known, and any subsequent promise to comply with the contract with full knowledge of the misrepresentation would preclude any relief to the lessee or purchaser. Fitzpatrick v. Flannagan, 106 U. S. 660, 1 Sup. Ct. 369, 27 L. Ed. 211. But Mrs. Browning cannot be allowed to hold the purchase money of property which she represented to be hers when she ought to have known it was not in existence, on the ground that the purchaser should not have relied on her representation. There is an obvious difference in the degree of promptness required for rescission and for abatement. Odbert v. Marquet (C. C.) 163 Fed. 892. No degree of diligence in ascertaining the deficiency could have affected its existence, or altered the fact that Mrs. Browning under the contract would receive money which was not her due. The demand for the abatement was made very soon after the deficiency was ascertained and communicated to the coal company by engineers appointed for the purpose of examination, and that was sufficient.

4. By demurrer it was contended that the misrepresentations, if any, were made to Boswell, and that his assignment of the lease contract to the coal company did not carry the right to claim damages for the misrepresentations. The principle does not apply where the right to damages is merely incidental to a subsisting substantial property right which has been assigned and which is itself susceptible of legal enforcement. National Valley Bank v. Hancock, 100 Va. 101, 40 S. E. 611, 57 L. R. A. 728, 93 Am. St. Rep. 933. Besides there can be no doubt that Mrs. Browning knew that the transaction with her was the initial step in a plan to form a coal company which would take over the property and work the mines. Being thus fully advised that the coal company was the real beneficiary of the contract, she is in privity with the company and liable to it as if she had contracted directly with it. Iowa, etc., Co. v. American, etc., Co. (C. C.) 32 Fed. 734; 20 Cyc. 80. The principle was strongly applied by this court in the recent case of National Bank v. Kershaw Oil Mill, 202 Fed. 90, 120 C. C. A. 362.

5. I am unable to agree that Mrs. Browning should escape abatement on the ground that the provision of the contract, "it is expressly understood and agreed between the parties hereto that this is a lease in gross and not by the acreage," refers to the extent of the coal seam. Courts do not favor contracts of hazard, and in arriving at the real agreement of parties, where a sale is made on the estimate of a given quantity, the presumption will always be indulged that the quantity controlled or influenced the price. McComb v. Gilkeson, 110 Va. 406, 66 S. E. 77, 135 Am. St. Rep. 944. Having sold her coal at a price based on her distinct representation that it underlay all the land leased, Mrs. Browning must point to something in the contract or other evidence clearly showing that the purchaser released her from the obligation imposed by the representation. The clause of the contract above quoted does not furnish this proof, for it expressly refers to the acreage of the land leased and not to the extent of the coal sold. To hold that Boswell by this provision of the contract meant to release Mrs. Browning from all obligation on account of her representations as to the quantity of coal purchased would be to impute to him great stupidity and put upon him and his assignees an unjust hardship by resorting to a forced construction of the agreement.

But, even if the clause quoted could be referred to the extent of the coal field, equity still requires relief for a deficiency so great that it is manifest the contract would not have been made had the truth been known. 39 Cyc. 1250, and cases cited. As is said in Wuest v. Mochrig, 24 Tex. Civ. App. 124, 57 S. W. 864:

"The court acts in such cases, not upon the contract exhibited by the deed merely, but because it is shown by the evidence that the deed does not operate as by the real contract it was intended, and conveys more or less than it should have done."

6. The next question to be considered is whether the District Judge erred in denying the motion made by Mrs. Browning to have the infant, James S. Browning, Jr., made a party defendant after the filing of the cross-bill or supplemental answer of Boswell and the coal company asking relief from the lease contract.

If the remedy of rescission of the contract were appropriate, or if the funds in the hands of Mrs. Browning and to come into her hands under the contract were not adequate to meet all the demands of the infant, the assignment of error on this point would be serious. But the wrong done to the lessees and purchasers was the untrue representation as to the area of the coal field made by Mrs. Browning and not participated in by the infant. For the damages resulting from this wrong, Mrs. Browning, and not her infant son, is primarily responsible. It is true that the infant might be required by a court of equity to abate any unjust enrichment coming to him at the expense of the lessees and purchasers, if full relief for them could not be obtained from Mrs. Browning. But as a practical matter, even if the abatement should be allowed, it would not be necessary to decree anything against the infant in this cause, since Mrs. Browning has in her hands abundant resources arising from her interest in the contract to provide for the abatement without affecting the interest of the infant.

True, the court with propriety might have granted the motion on behalf of the infant to be made a party so that he might appear by guardian ad litem, and might have decided between the infant, James S. Browning, Jr., and Mrs. Browning what he ought in good conscience to contribute to the abatement, since it would be manifestly unjust to allow him to profit by her mistake as to the extent of the common property: McComb v. Gilkeson, 110 Va. 406, 66 S. E. 77, 135 Am. St. Rep. 944. But it is not necessary to send the case back on that issue, for Mrs. Browning and the infant both contend that his rights should be settled in the circuit court of Tazewell county, and the other parties cannot object to that course. Mrs. Browning, therefore, could ask in that court for any relief against the infant, James S. Browning, Jr., which might be properly due her.

7. It is not possible to arrive at the just measure of abatement with absolute accuracy, because Boswell knew some of the land was occupied by the railroad and some by the creek bed; that some had already been mined; and that some had been injured by Mrs. Browning's bad mining. It would serve no good purpose to extend this opinion by analysis of the evidence and computations. Consideration of the matter leads to the conclusion that the methods of stating the proportion and making the deductions adopted by the District Judge are as nearly correct as it is possible to make them. It is true, as argued by counsel for the appellant, that the portion of the coal field remote from the plant and to be worked in the future must have been considered by the parties less valuable, acre for acre, than that near the plant and to be worked immediately. But this consideration is offset by another, which is apparent, that, acre for acre, the value of the large coal field which Boswell supposed he was buying was greater than that of the small one which he actually acquired.

I am of the opinion, also, that the estimate of $25,000 as the value of the old plant is liberal to Mrs. Browning.

In my opinion the decree of the District Judge should be modified, and the cause remanded for such further proceedings as would be necessary to carry out the conclusions herein expressed.